UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHRISTOPHER SANDERS,

                    Plaintiff,

v.                                        Case No. 3:14-cv-1493-J-34PDB

JOHN C. GREENE, et al.,

                    Defendants.
_____

**<u>ORDER</u>**

**I. Status**

Plaintiff Christopher Sanders, an inmate of the Florida penal system, initiated this action on December 15, 2014, by filing a Civil Rights Complaint (Doc. 1) pursuant to 42 U.S.C. § 1983. He filed an Amended Complaint (Doc. 28) on August 26, 2016, and a Second Amended Complaint (SAC; Doc. 97) on August 9, 2017. In the SAC, Sanders names the following individuals as Defendants: (1) John C. Greene; (2) Charles P. Richter; (3) John A. Coates; (4) Brandon Stratton; (5) Hope Gartman; (6) Christopher Landrum; (7) Philip E. Davis;[1] (8) Nancy Crawford; (9) Thomas Wainwright; (10) Thomas North; (11) Jeffrey Beasley; (12) Michael Crews; (13) Brad A. Howard; (14) Cindy Meeks; (15) Chase Markham; (16) Chad Robertson; (17) Markus Jackson; (18) Arthur Riegel III; (19) Walter

_____

[1] The Court dismissed Davis on August 17, 2017. <u>See</u> Order (Doc. 100).

Mock; (20) Daniel Russell; (21) D.P. Capen; (22) C. Lim; (23) J.O. Perry; (24) Angela Bridges; (25) Bryan Williamson; (26) Robert Lamberson; (27) Jeremy Powe; (28) C. Murphy; and (29) V. Randle. Sanders asserts that the Defendants violated his First, Fourth, and Eighth Amendment rights when they retaliated against him for filing grievances and reporting the injustices to his mother, maliciously searched his cell, used excessive force against him, and denied him proper medical treatment. As relief, Sanders requests compensatory and punitive damages and declaratory and injunctive relief.

This matter is before the Court on Defendants Beasley, Howard, North, Crawford, Greene, Markham, Mock, Richter, Riegel, Robertson, Russell, Wainwright, Powe, Lamberson, Jackson, Gartman, Crews, Landrum, Capen, Coates, Stratton and Williamson's Motion for Summary Judgment (Motion; Doc. 129) and Defendants Lim, Perry, Bridges, Meeks, Randle and Murphy's Motion for Summary Judgment (Motion II; Doc. 128). They submitted exhibits in support of their requests for summary judgment. See Def. Exs. A-QQ; Doc. 127-1.[2] The Court advised Sanders of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation

---

[2] With the Court's permission, see Order (Doc. 138), the Defendants filed three digital video discs (videos) under seal, see Defendants' Exhibits to Be Filed Under Seal (Doc. 140); Notice (Doc. 139); Def. Exs. T; AA; BB.

on the matter, and gave him an opportunity to respond to the motions. See Summary Judgment Notice (Doc. 133); Order Directing Service of Process Upon Defendants; Notice to Plaintiff; Special Appointment (Doc. 30) at 4-5, ¶ 10. Sanders responded. See Declaration in Opposition to Defendants' Motion for Summary Judgment (Response; Doc. 137) with exhibits (P. Ex.); Declaration in Opposition to Medical Defendants' Motion for Summary Judgment (Response II; Doc. 141). Defendants' motions are ripe for judicial review.

## II. Plaintiff's Allegations[3]

In his verified SAC,[4] Sanders asserts that he was housed in the inpatient mental health transitional care unit in H dormitory at Suwannee Correctional Institution (SCI). See SAC at 10, ¶ 1. He states that, on February 16, 2014, he submitted a grievance and asserted that Dr. Lim and the multi-disciplinary services team refused "to give [him] a mental health level in hopes that [he] would go off so they could jump on [him] with the cell extraction team." Id. at ¶ 2. According to Sanders, after he filed the

_____

[3] The facts recited here are drawn from the verified SAC and may differ from those that ultimately can be proved.

[4] See Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014) (citations omitted) ("The factual assertions that [Plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [Plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations.").

grievance, Greene instructed him that he should stop writing grievances and stop having his mother call the prison's administration, and if he did not, Greene "had ways of making [him] stop." Id. at 10-11, ¶ 3.

Sanders asserts that, on April 11, 2014, Richter told him that he, Richter, would put Sanders on property restriction on the following day because he "was putting as many blacks on strip (property restriction) as he could." Id. at 11, ¶ 4. Sanders states that Riegel gave him a telephone, so he called his mother and told her about Richter's plan. See id. at ¶ 5. According to Sanders, on April 12th, his mother called and informed the administration about Richter's plan. See id. at ¶ 6. He avers that, on that same day, Richter, Stratton, Coates and another officer came to his cell, and Richter told Sanders that his mother could not "save" him by contacting the administration. Id. at ¶ 7. Sanders asserts that, after that, Stratton refused to feed him lunch and dinner and told him that he was complying with Richter's directives. See id. at ¶ 8. He declares that Stratton commented that if it was his decision, he would summon "the five biggest Mother fu**ers and run in [Sanders'] cell and beat [his] ass." Id. Sanders states that Richter directed Riegel to place Sanders on property restriction "to make up for Sgt. Riegel giving Sanders the phone and to make it look like Sgt. Richter had nothing to do with it." Id. at ¶ 9. Sanders maintains that Riegel wrote a false disciplinary report

(DR) against Sanders for misuse of state property, forced Sanders to sleep on a steel bunk, and confiscated Sanders' clothing and personal property to cover up his "maliciously placing Sanders on property restriction." Id. at 13, ¶ 10.

According to Sanders, on April 15th, he submitted an emergency grievance to Warden Landrum, who said he forwarded it to Inspector Beasley; however, no one interviewed Sanders, and nothing was done to remedy the misconduct. See id. at ¶ 11. Sanders asserts that, on April 17th, he informed Dr. Lim about the April 12th abuse, but she neither filed an incident report nor informed the administration. See id. at ¶ 12. He states that after speaking with Dr. Lim, Stratton escorted him back to his cell and told him that "it was just a matter of time" before he and Richter "fu** his black ass up." Id. at ¶ 13. Sanders maintains that he tried to inform Assistant Warden Mock, but Mock told him he "better get off the door before he has him put on property restriction." Id. at ¶ 14. Sanders avers that he complained to his mother, who spoke with Assistant Warden Gartman on April 18th; and Gartman directed Lieutenant Woods to escort Sanders to the medical clinic for Nurse Murphy to check him. See id. at ¶¶ 15, 16, 17.

Sanders asserts that, on April 18th, Crawford came to his cell and told him they were going to "break" him of his "little habits" (writing grievances). Id. at ¶ 18. According to Sanders, that same day, Crawford directed Robertson and Capen to take Sanders out of

his cell, search his cell, and place him on property restriction; they would have summoned the cell extraction team if Sanders had not yelled at the handheld camera that he was not refusing to exit his cell. <u>See</u> <u>id.</u> at 14, ¶¶ 19, 20. He states that Landrum reviewed the camera footage, but "did not do anything to help Sanders." <u>Id.</u> at ¶ 21. Sanders declares that, on April 20th, he told Gartman about what had transpired on April 12th with Richter and Stratton and with Crawford, Robertson and Capen on April 18th. <u>See</u> <u>id.</u> at ¶ 22. According to Sanders, Gartman told him "they kick ass" at SCI, and that Sanders was "lucky" she did not oversee the cell extraction team when he initially refused to be seen by the medical staff on April 18th. <u>Id.</u>

Sanders maintains that, on April 21st, Richter and Greene placed a magnet over his window to try to get him to "go off" or declare a mental health emergency so they could pull him out of his cell and "jump on him in the blind spot in the hallway." <u>Id.</u> at ¶ 23. According to Sanders, when he refused to "go off," Greene and Richter acted like Sanders had his vent covered and told him that the camera "sees me pointing at your vent and telling you to uncover your vent[,] that's three more days on strip fu** boy." <u>Id.</u> at 14-15, ¶ 24. Sanders states that Richter then wrote a false DR against him to keep him on property restriction. <u>See</u> <u>id.</u> at 15, ¶ 25.

According to Sanders, on April 24th, Greene and Crawford used the cell extraction team to "jump on" him. Id. at ¶ 26. Sanders asserts that an inmate yelled to him that Greene and Crawford "were suiting up the cell extraction team," so he tied up his property in a sheet and stored it under his bunk. Id. at ¶ 27. He states that, when the cell extraction team arrived, he yelled to the camera that he was not refusing to exit and that he wanted to submit to hand restraints; nevertheless, the cell extraction team proceeded anyway. See id. at ¶ 28. He avers that Greene refused to open the food flap and permit him to submit to hand restraints and told the camera that Sanders was refusing to "cuff up." Id. at ¶ 29. Sanders describes what transpired when the cell extraction team (Powe, Jackson, Russell, Williamson, and Lamberson) initially tried to enter his cell.

> [Sanders] squeezed his body past them and fell on the floor outside of his cell because [he] knew from watching Lt. Greene use the cell extraction team on other inmates that if he didn't get out [of] the cell they were going to jump on him because the fixed wing camera couldn't see what they were doing inside the cell and the officer with the handheld camera would point it at Lt. Greene's back so that what they were doing wouldn't be caught on camera.

Id. at ¶ 30. Sanders states that Williamson "pinned [him] down" with a shield on the floor outside the cell. Id. at ¶ 31. He recalls that he screamed to the handheld camera that he was outside his cell and not resisting the officers. See id. He asserts that

Jackson and another officer grabbed his legs and pulled him back into the cell, and then punched, kicked, and twisted his legs and arms, while Lamberson, Powe, Williamson and Russell hit him in the back, legs, ribs and arms. See id. at 15-16, ¶ 32. Sanders contends that Jackson grabbed his left hand, dislocated Sanders' left thumb, and then popped it back into place; he screamed to the camera about what Jackson had done. See id. at 16, ¶ 32. He maintains that, although he was not resisting, Greene continued to yell "stop resisting" to cover up the misconduct. Id. at ¶ 33. He alleges that, after Greene "felt they had done enough damage," they placed restraints on him and escorted him to the nurses station where he complained to Nurse Perry about his swollen, bruised left thumb and chest pains. Id. at ¶¶ 34, 35. Sanders states that Perry never documented his injuries and told him that the corrections officers should have broken his thumb. See id. at ¶ 35. Sanders notes that, after Perry's examination, officers escorted him to cell 3112 in H dormitory. See id. at ¶ 36. According to Sanders, from April 25th through May 11th, Greene directed Coates to give Sanders an "air diet" (empty food trays). Id. at ¶ 37.

Sanders asserts that, on April 28th, when he submitted a sick call form, Nurse Bridges refused to have him pulled from his cell in an effort to cover up the injuries he had suffered on April 24th. See id. at ¶ 38. According to Sanders, from April 28th through May 17th, when he submitted several sick call forms,

Bridges and Murphy refused to have officers escort him to the medical clinic. See id. at ¶ 39. He states that when he gave Bridges a sick call form on May 7th, she "ripped it up right in front of [him]." Id. at ¶ 40. He recalls that he submitted a grievance on May 9th, and was seen on May 17th; however, the swelling of his thumb had lessened, and the bruise was almost completely gone. See id. at ¶ 39. He states that, when he appealed the grievance related to Bridges and Murphy, he never got a response, only copies of the original grievance he filed. See id. at ¶ 41.

Sanders complains that, on May 5th, he spoke with Assistant Warden Gartman and told her about: Greene and Crawford using the cell extraction team to "jump on" him; Richter, Stratton, and Coates refusing to feed him; and Greene directing Coates to place empty trays in his food box. Id. at 16-17, ¶ 42. He states that Gartman told him that she did not care, and it would be in his best interest to tell his mother to stop calling the administration. See id. at 17, ¶ 43. According to Sanders, after Gartman left Sanders' cell, Coates continued to put empty trays in his food box until Sanders' mother called the office of the Florida Department of Corrections (FDOC) Secretary Crews and filed a complaint. See id. at ¶ 44. He asserts that Greene told him that Coates would continue to give him empty food trays until he stopped writing grievances. See id. at ¶ 45.

Sanders alleges that, on May 11th, Coates "crept" to his cell when he thought Sanders was asleep, and called Richter on his radio to tell him to meet him there. Id. at ¶ 46. Sanders states that he jumped up when he heard Coates on the radio, and ran to his cell door. See id. According to Sanders, Coates told him that he, Coates, was going to enter the cell and "fight him one on one," but Sanders "had to play like he was non-responsive," so Coates could enter. Id. Sanders recalls that he told Coates he would neither play non-responsive nor allow Coates or anyone else to enter his cell. See id. Additionally, he states that Richter came to his cell and asked if he was non-responsive. See id. at ¶ 47. Sanders asserts that, when he told Richter he was "not non-responsive," Richter said that he "will be," told Coates to stay at Sanders' cell, and then walked away. Id. Next, Sanders avers that when Nurse Murphy came to his cell to check on his status and saw that he was responsive, she told him "to stop playing like that." Id. at ¶ 48. He recalls that he informed her that Richter and Coates were lying, and that he "was not playing." Id. According to Sanders, Coates was "mad" he could not "jump on" him, and therefore told Sanders that he would feed him at lunch only if he "played non-responsive," so Coates could enter his cell. Id. at 17-18, ¶ 49. Sanders maintains that he again told Coates that he was "not playing non-responsive." Id. at 18, ¶ 49.

Sanders asserts that, later on the same day, Stratton told him that he was "lucky" Nurse Murphy had visited his cell "being nosey" because he, Richter, and Coates were going to enter his cell and beat him until he was "unrecognizable." Id. at ¶ 50. He states that Richter later came by his cell and told him that, if he exited his cell, they would "do him" like they (North, Davis, Coates, and Richter) had done with inmate King Davis (#L42132) a few days earlier in the blind spot outside of H dormitory's wing three. Id. at ¶ 51. Sanders alleges that North came to his cell and told him "he was going to set it up" so they could "jump on" him. Id. at ¶ 52. Sanders avers that, on the same day, he submitted an emergency grievance to Warden Landrum and a grievance to FDOC Secretary Crews, see id. at ¶ 53, and complained that his life was in danger because Coates, Stratton, Greene, and Richter planned to assault him in the blind spot outside of H dormitory's wing three, but Landrum and Crews "did nothing to protect him," id. at 23, ¶ 85. Sanders maintains that he received an FDOC response to his grievance only after Richter, Stratton, Coates, Markham, North, Wainwright, and Greene had assaulted him on May 20, 2014. See id. at 18, ¶ 53.

According to Sanders, on May 20th, Coates and Stratton informed him that he had to leave his cell for a tuberculosis shot. See id. at 18, ¶ 54. Sanders asserts that when he refused, Stratton advised him that Assistant Warden Gartman said he had to exit his

cell for a shot. See id. Sanders avers that he remembered that
Gartman had told him on May 5th that he must exit his cell for
call-outs, and if he refused to leave for a tuberculosis shot, they
could use the cell extraction team to remove him from the cell, and
therefore, he turned around and submitted to hand restraints. See
id. He avers that Stratton placed hand restraints on him, opened
the cell door, grabbed his arm, and "started squeezing it really
hard." Id. at 18-19, ¶ 55. Sanders recalls that he "could feel
Stratton shaking as he gripped [his] arm" while they waited for the
control booth officer to open the door. Id. at 19, ¶ 55. Sanders
describes what transpired when they entered the blind spot outside
of H dormitory. See id. at 19, ¶ 56.

> Stratton tripped and slam[m]ed Sanders on the
> floor really hard, then Sgt. Richter and Ofc.
> Coates ran over and started punching, kicking
> and hitting Sanders in the legs, arms and back
> while Stratton squat[t]ed in front of Sanders
> and started banging Sanders['] head against
> the floor until he busted Sanders['] right eye
> open and then started hitting him in the arms,
> legs, and back while Lt. Greene stood by
> watching Stratton, Coates, and Richter beating
> Sanders.

Id.

He states that, after the beating, Richter told Coates: "you
know he's going to write us up for this," and Coates replied: "I
ain't worried [because] he has a house on the streets [and] I'll
kill his whole family if I get fired." Id. at ¶ 57. Sanders
maintains that, when an officer arrived on the scene with a camera,

12

he yelled into the camera what had happened. See id. at ¶ 58. Sanders admits that he spat on Coates during an escort to the nurses station, see id. at ¶ 59, and received a DR for battery, see id. at 22, ¶ 84, but explains that he did so

> when out of fear, anger, and mental and emotional distress Sanders turned and spit at Ofc. Coates because he was squeezing [Sanders'] injured arm.

Id. at 19, ¶ 59. Sanders recalls that Cortese and Coates also slammed him on the floor. See id. at ¶ 60. He asserts that they escorted him to the nurses station where Nurses Randle and Jane Doe documented his injuries, called "the emergency area," and advised Sanders that he needed stitches near his right eye and x-rays on his shoulder. Id. Sanders avers that Greene placed him in a holding cell where he had the camera "cut off" instead of escorting Sanders directly to the emergency clinic. Id. at 19-20, ¶ 62. Sanders states that Richter came to the holding cell and told him that "it wasn't over yet and he was going to pay for spitting on Ofc. Coates." Id. at 20, ¶ 63. He asserts that Richter, Wainwright, Markham and Stratton, "but I'm not sure[,]" went into the office across from the holding cells and "conspired" against him to decide who would jump on him the next time. Id. at ¶ 64. Sanders alleges that Nurse Randle exited the nurses station and said: "They [are] going to kick your ass." Id. at ¶ 65. He maintains that he asked Randle for help, but she replied that she had nothing to do with

it, went into the records room across from the nurses station, and closed the door. See id. at ¶ 66.

Next, Sanders avers that Davis and Wainwright removed him from the holding cell, escorted him outside, walked at a fast pace, pulled him "to make it look like he was resisting," slammed him down on the concrete sidewalk, and hit him while he was restrained. Id. at ¶ 67. Sanders describes what transpired during the escort.

> Due to the spit shield that was placed on Sanders, he could not see who was doing what but he knows it was Lt. North, Sgt. Richter, Ofc. Davis, Ofc. Wainwright and Ofc. Markham who [were] hitting him and Ofc. Markham was twisting and bending Sanders['] fingers and wrist while he was in restraints.
>
> Markham continued to twist and bend Sanders['] fingers and wrist as Markham and Ofc. Cortese walked Sanders back into the H dorm and the nurses station with a different use of force camera watching Plaintiff Sanders.

Id. at ¶¶ 68, 69. Sanders states that, while in the nurses station, he tried to tell Nurse Randle and Nurse Jane Doe about his injuries, but North told Sanders to "shut the f**k up or he was going to kick [Sanders'] teeth out," so "out of fear" he stopped telling the nurses about his injuries. Id. at ¶ 70. Sanders alleges that "a Captain Sanders" entered the nurses station, and advised North "to do everything right because he wasn't trying to get fired" due to "one of Greene's fu** ups." Id. at 21, ¶ 71. Sanders avers that he was taken to "the emergency area" where Nurse Sap-Edwards and an unknown doctor gave him two stitches in his

right eyebrow. Id. at ¶ 72. According to Sanders, upon return to his cell in full restraints (shackles, handcuffs, black box, and waist chains), North ended the use of force video. See id. at ¶ 73. Sanders maintains that Greene, Richter, and Markham later arrived at his cell and removed the restraints. See id.

According to Sanders, after "an undetermined amount of time," Greene, Richter, and Davis told him "to cuff up," so they could escort him for x-rays on his shoulder. Id. at ¶ 74. He recalls that when he told Greene it would hurt to move his arm behind his back, Greene told him that he "didn't give a f**k and either [he] put his arm behind his back or he was refusing the x-rays." Id. Sanders states that he succumbed to handcuffing because "he really needed the x-rays." Id. at ¶ 75. He asserts that, during the escort to G dormitory for x-rays, Greene advised him that "if he stopped writing grievances[,] it was all over[,] but if he got one grievance about what had just taken place[,] it was going to start all over again." Id. at ¶ 76. Sanders alleges that, when Greene looked at the x-rays, he said "we broke that mother fu**er good." Id. at ¶ 77. Sanders avers that when Richter escorted him to an ambulance that ultimately delivered Sanders to Jacksonville Memorial Hospital (JMH), Richter told him that he "was done for now[,] but when Sanders got back from the hospital he [(Richter)] was going to finish what he had started but next time Sanders was going to be life flighted." Id. at 22, ¶ 78.

Sanders asserts that JMH medical staff performed a computerized axial tomography (CAT) scan and took additional x-rays on his hands and right arm, and recommended that he have surgery the next day. <u>See</u> <u>id.</u> at ¶ 79. Sanders declares that he stayed at JMH from May 20th until May 23rd, and was discharged without having the recommended surgery. <u>See</u> <u>id.</u> at ¶ 80. According to Sanders, the FDOC housed him with a broken arm at the Reception and Medical Center (RMC) from May 23rd until July 14th, and Dr. Robert J. Kleinhans, M.D. recommended him for surgery on June 29th. <u>See</u> <u>id.</u> at ¶ 81. He alleges that the bone in his right arm healed improperly, and therefore, on July 14th, Dr. Kleinhans "had to rebreak" his arm and place pins, screws, and a rod in the bone so it would heal properly. <u>Id.</u>

Sanders declares that he submitted an emergency grievance to FDOC Secretary Crews and informed him about what had occurred at SCI. <u>See</u> <u>id.</u> at ¶ 82. The FDOC denied his grievance, and E. Stine responded that the subject of the grievance was under review. <u>See</u> <u>id.</u> Additionally, Sanders states that he submitted a grievance to Inspector General Beasley on July 14th, and E. Stine responded that when an incident is reported to the Inspector General, it is no longer a grievance issue. <u>See</u> <u>id.</u> at ¶ 83.

According to Sanders, on December 8th, he saw "a portion" of the May 20th use of force video depicting Nurse Jane Doe giving him a shot after "the second use of force" that day. <u>Id.</u> at 23, ¶ 88.

Sanders contends that although the video also shows him being escorted back to cell H3112 before being placed in the holding cell across from the officers' office, he does not recall being escorted back to cell H3112 before being placed in that holding cell. See id. at ¶¶ 89, 90. As such, he maintains that Inspector Brad Howard manipulated the use of force video to start when Sanders was already on his feet after Richter, Coates, and Stratton had jumped on him. See id. at ¶ 91.

### III. Summary Judgment Standard

The Eleventh Circuit set forth the summary judgment standard.

> Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The substantive law controls which facts are material and which are irrelevant. Raney v. Vinson Guard Service, Inc., 120 F.3d 1192, 1196 (11th Cir. 1997). Typically, the nonmoving party may not rest upon only the allegations of his pleadings, but must set forth specific facts showing there is a genuine issue for trial. Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir. 1990). A pro se plaintiff's complaint, however, if verified under 28 U.S.C. § 1746, is equivalent to an affidavit, and thus may be viewed as evidence. See Murrell v. Bennett, 615 F.2d 306, 310 n.5 (5th Cir. 1980). Nevertheless, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge." Fed.R.Civ.P. 56(c)(4). "[A]ffidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment." Ellis v. England, 432 F.3d 1321, 1327 (11th Cir. 2005).
>
> As we've emphasized, "[w]hen the moving party has carried its burden under Rule 56[],

> its opponent must do more than simply show
> that there is some metaphysical doubt as to
> the material facts ... Where the record taken
> as a whole could not lead a rational trier of
> fact to find for the non-moving party, there
> is no 'genuine issue for trial.'" <u>Matsushita
> Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475
> U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d
> 538 (1986). "[T]he mere existence of <u>some</u>
> alleged factual dispute between the parties
> will not defeat an otherwise properly
> supported motion for summary judgment; the
> requirement is that there be no <u>genuine</u> issue
> of <u>material</u> fact." <u>Anderson v. Liberty Lobby,
> Inc.</u>, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91
> L.Ed.2d 202 (1986). Unsupported,
> conclusory allegations that a plaintiff suffered a
> constitutionally cognizant injury are
> insufficient to withstand a motion for summary
> judgment. <u>See</u> <u>Bennett v. Parker</u>, 898 F.2d
> 1530, 1532-34 (11th Cir. 1990) (discounting
> inmate's claim as a conclusory allegation of
> serious injury that was unsupported by any
> physical evidence, medical records, or the
> corroborating testimony of witnesses).
> Moreover, "[w]hen opposing parties tell two
> different stories, one of which is blatantly
> contradicted by the record, so that no
> reasonable jury could believe it, a court
> should not adopt that version of the facts for
> purposes of ruling on a motion for summary
> judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380,
> 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

<u>Howard v. Memnon</u>, 572 F. App'x 692, 694-95 (11th Cir. 2014) (per

curiam) (footnote omitted); <u>Hinkle v. Midland Credit Mgmt., Inc.</u>,

827 F.3d 1295, 1300 (11th Cir. 2016).

At the summary judgment stage, the Court views all facts in

the light most favorable to Plaintiff, as the non-moving party, and

draws all inferences in Plaintiff's favor. <u>See</u> <u>McKinney v. Sheriff</u>,

520 F. App'x 903, 905 (11th Cir. 2013) (per curiam). "[T]he dispute

about a material fact is genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Hinkle, 827 F.3d at 1300 (internal quotations and citation omitted). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Thus, summary judgment is appropriate only if, under Sanders' version of the facts, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Felio v. Hyatt, 639 F. App'x 604, 606 (11th Cir. 2016) (per curiam) (internal quotations and citation omitted).

### IV. Law and Conclusions

#### A. Eighth Amendment Excessive Use of Force and Failure to Intervene

Sanders asserts that Defendants Greene and Crawford used the cell extraction team (Defendants Powe, Jackson, Russell, Williamson, and Lamberson) to forcibly remove him from his cell on April 24, 2014. See SAC at 15-16, ¶¶ 30-32. Defendants contend that the use of force that day "was necessary . . . to seek compliance with an order," and the video evidence disputes Sanders' assertions. Motion at 21-22 (citing Def. Exs. F; N; O; P; Q; R; S; T). Sanders also alleges that the Defendants assaulted him on May 20, 2014, during three related incidents involving (1) Defendants

Stratton, Richter, and Coates in the blind spot outside of H dormitory, as Defendant Greene watched, see SAC at 19, ¶ 56; (2) Defendant Coates after Sanders spat on him, see id. at ¶¶ 59, 60; and (3) Defendants North, Richter, Wainwright, and Markham outside of H dormitory, see id. at 20, ¶¶ 68, 69. Defendants state that "the first use of force [on May 20th] occurred as a spontaneous use of force which became necessary for Defendant Stratton to maintain control of [Sanders] when [he] attempted to break his grasp." Motion at 23 (citing Def. Exs. D; X). As to the second use of force incident, Defendants contend that "[t]he video shows that [Coates] use[d] no more force than necessary to hold [Sanders] until a spit shield was obtained." Id. at 24 (citing Def. Exs. Z; AA). With regard to the third incident, Defendants claim that Officer Davis, with the assistance of Defendant Wainwright, took down and secured Sanders who was "belligerent" during an escort, and Defendant Markham thereafter assisted with the escort. Id. (citing Def. Exs. CC; QQ).

With respect to the appropriate analysis in an excessive use of force case, the Eleventh Circuit has explained.

> [O]ur core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). In determining whether force was applied maliciously and sadistically, we look to five factors: "(1) the extent of injury; (2) the need for application of force; (3) the relationship

> between that need and the amount of force
> used; (4) any efforts made to temper the
> severity of a forceful response; and (5) the
> extent of the threat to the safety of staff
> and inmates[, as reasonably perceived by the
> responsible officials on the basis of facts
> known to them]..." <u>Campbell v. Sikes</u>, 169 F.3d
> 1353, 1375 (11th Cir. 1999) (quotations
> omitted).[5] However, "[t]he Eighth Amendment's
> prohibition of cruel and unusual punishments
> necessarily excludes from constitutional
> recognition de minimis uses of physical force,
> provided that the use of force is not of a
> sort repugnant to the conscience of mankind."
> <u>Hudson</u>, 112 S.Ct. at 1000 (quotations
> omitted).

<u>McKinney v. Sheriff</u>, 520 F. App'x 903, 905 (11th Cir. 2013) (per curiam). "When considering these factors, [courts] 'give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance.'" <u>Fennell v. Gilstrap</u>, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam) (quoting <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1311 (11th Cir. 2007)).

"The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition <u>de minimis</u> uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Hudson v. McMillian</u>, 503 U.S. 1, 9-10 (1992) (internal quotations and citations omitted). Indeed, not "every malevolent touch by a prison guard gives rise to a federal cause of action." <u>Id.</u> at 9 (citation

---

[5] <u>See</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986).

omitted). "While a lack of serious injury is relevant to the inquiry, '[i]njury and force . . . are only imperfectly correlated and it is the latter that ultimately counts.'" Smith v. Sec'y, Dep't of Corr., 524 F. App'x 511, 513 (11th Cir. 2013) (per curiam) (quoting Wilkins v. Gaddy, 559 U.S. 34, 38 (2010)). "A prisoner may avoid summary judgment, 'only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain.'" Stallworth v. Tyson, 578 F. App'x 948, 953 (11th Cir. 2014) (quoting Brown v. Smith, 813 F.2d 1187, 1188 (11th Cir. 1987)).

Moreover, "an officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000); Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998). This liability, however, only arises when the officer is in a position to intervene and fails to do so. See Keating v. City of Miami, 598 F.3d 753, 764 (11th Cir. 2010); see also Fils v. City of Aventura, 647 F.3d 1272, 1290 n.21 (11th Cir. 2011); Brown v. City of Huntsville, 608 F.3d 724, 740 n.25 (11th Cir. 2010) ("Because the relevant events happened so quickly, the record does not reflect any point at which [the officer] could have intervened to prevent [another officer's] use of excessive force . . . .").

## 1. April 24, 2014 Cell Extraction

Sanders asserts that Defendants Greene and Crawford summoned the cell extraction team to forcibly remove him from his cell on April 24th. <u>See</u> SAC at 15-16, ¶¶ 30-32. The Defendants submitted a video under seal that shows the extraction team's removal of Sanders from his cell. <u>See</u> Def. Ex. T. The video depicts the extraction team's involvement over a period of less than ten minutes, and the team's removal of Sanders from his cell in less than three minutes. <u>See</u> <u>id.</u> As shown on the video, the following events transpired.

On April 24th, at 11:07 a.m.,[6] Defendant Greene, as a supervisor, introduced Officer Mario Coronado, the operator of the handheld camera, who announced the same date and the time as 11:08 a.m. <u>See</u> <u>id.</u> Greene read the reasons for summoning the cell extraction team for assistance: Sanders created a disturbance and refused to submit to hand restraints for a cell movement; Housing Sergeant Patten counseled Sanders and ordered him several times to cease his disruptive actions and submit to hand restraints; Greene also made several attempts to counsel Sanders and ordered him numerous times to cease his unruly actions and submit to hand restraints, to no avail; all reasonable efforts to control Sanders were exhausted, and all efforts to counsel him failed; the need to

---

[6] Throughout the video, Defendant Greene and Officer Coronado use their wrist watches to announce the passage of time because the camera does not have its own time display. <u>See</u> Def. Ex. T.

remove Sanders from the cell continued to exist; and Major Geiger was contacted and authorized "an organized use of force cell extraction" if necessary to overcome Sanders if he continued to resist a lawful order. Id.

Additionally, Greene asked the team members to introduce themselves and describe their responsibilities. See id. Defendant Powe, the first team member, stated that he would enter the cell first and use a shield and his body weight to immobilize Sanders by pinning him to a wall, floor, or bed while protecting other team members. See id. Defendant Jackson, the second team member, explained that he would push the first team member into the cell, control Sanders' upper extremities, and assist the third team member with handcuffing. See id. Defendant Russell, the third team member, announced that he would push the second team member into the cell, control Sanders' upper extremities, place Sanders' arms behind his back, apply handcuffs, and signal that Sanders' hands were cuffed by announcing "cuffs on." Id. Defendant Williamson, the fourth team member, explained that he would push the third team member into the cell, control Sanders' lower extremities, and assist the fifth team member in placing leg irons on Sanders. See id. And, Defendant Lamberson, as the fifth man, declared that he would push the fourth team member into the cell, control Sanders' lower extremities, apply leg restraints to Sanders' ankles, and

then signal that his legs were cuffed by stating "leg irons on."
Id.

Next, Greene gave the extraction team detailed instructions:
"use extreme caution" because Sanders may have a weapon and use his
mattress to keep the team from entering the cell,[7] and use only the
minimal amount of force necessary to overcome his resistance. Id.
With Greene leading, all five team members marched to Sanders' cell
as Sanders repeatedly yelled that he was willing to submit to
cuffing. See id. As they arrived at the cell front, Greene gave
Sanders a final opportunity to submit to cuffing and then announced
that Sanders refused his directive to "turn around" to submit to
handcuffing. Id. When the team began to enter the cell, Sanders
exited the cell and lay on the floor in the outer hallway. See id.
As Greene ordered Sanders to move back into the cell, the team
pushed Sanders back inside. See id. Greene signaled and directed
the cameraman to follow him, so the cameraman could film the entire
extraction without hindrances. See id. Sanders yelled that he was
ready to submit to cuffing, yet retreated underneath his bunk. See
id. Greene repeatedly directed Sanders to put his hands behind his
back, stop resisting the cell extraction team, get out from
underneath the bunk, and cease his disorderly conduct. See id. The
team pulled Sanders out from underneath his bunk; Defendant Powe

_____

[7] See Def. Ex. N, DR, Log No. 230-140703 ("I then observed
Inmate Sanders use his state issued mattress to block the door of
the cell."), dated April 24, 2014.

placed his knee on Sanders' back and used his body weight to pin Sanders to the floor, as the other team members applied the hand and leg restraints. See id.

In a use of force report narrative, Defendant Powe states:

> [Sanders] failed to comply with [the] final order to submit to hand restraints for the purpose of a cell relocation. The cell extraction team utilized force to bring inmate Sanders into compliance with orders given. Upon cell H2-211 being cycled [the] inmate charged the cell extraction team and I then redirected him to the floor in the doorway of the cell utilizing the non-electric shield to which [the] inmate continued to attempt to pull himself out of the cell. I was instructed to pull inmate Sanders back into the cell for restraints to be applied. Once inmate Sanders was back in the cell he broke my grasp and pulled himself under the bunk. I then assisted in pulling inmate Sanders from under his bunk and placed my knee in his back and utilized my body weight to pin him to the floor and assisted placing his hands behind his back, while restraints were being applied to him by the other team members with the minimal amount of force necessary.

Def. Exs. P; S, Declaration of Jeremy Powe (Powe Declaration). The other team members provide similar accounts of what transpired during the cell extraction, how Sanders charged the team, attempted to pull himself out of the cell into the outer hallway, broke Powe's grasp, and pulled himself under his bunk. See Def. Exs. R, Declaration of Markus Jackson (Jackson Declaration); O, Declaration of Daniel Russell (Russell Declaration); Amended Notice of Filing

Exhibit Q (Doc. 132), Def. Ex. Q, Declaration of Robert Lamberson (Lamberson Declaration).[8]

Additionally, Defendants Greene and Powe provided detailed accounts in the Incident Report. Powe stated, in pertinent part:

> Inmate Sanders charged the cell door and attempted to defeat the cell extraction team by forcing his way out of the cell to which I redirected him to the floor utilizing the non-electronic shield. Inmate Sanders also attempted to impede the forced cell extraction by blocking the doorway of his cell with his state issued bed mattress and personal property. Due to Inmate Sanders being in the doorway of the cell I was instructed to pull him back into his cell. Subsequent to clearing the doorway Inmate Sanders defeated my grasp and climbed under the bunk. Once Inmate Sanders was removed from under the bunk I placed my knee in his back and pinned him to the floor utilizing my body weight. I then assisted Officers M. Jackson and D. Russell by placing [the] Inmate's hands behind his back while restraints were being applied, using only the minimal amount of force necessary. Inmate Sanders ceased all disruptive behavior subsequent to the cell extraction team applying hand and leg restraints, and all force by me ceased at this time.

Def. Ex. P, Incident Report. As a supervisor, Greene provided the following narrative:

> Inmate Sanders did state that he would comply with orders to submit to restraint[s] but refused all orders to turn around and put his hands behind his back and took a defensive stance. Upon the cell door being opened Inmate Sanders charged the cell extraction team and attempted to exit his cell but was redirected to the floor by Sergeant Powe. Inmate Sanders

---

[8] Defendant Williamson did not provide a declaration.

> continued to attempt to exit his cell by
> pulling himself out of the cell. I then
> instructed the cell extraction team to pull
> Inmate Sanders back into his cell so that
> restraints could be safely applied due to the
> cell being on the upper floor. Subsequent to
> clearing the doorway Inmate Sanders defeated
> the cell extraction team's grasp and climbed
> under the bunk. Inmate Sanders was removed
> from under the bunk but refused all orders to
> place both his hands behind his back and
> continued to hold on to the bunk with his
> right hand. Once restraints [were] applied
> Inmate Sanders was escorted to the H-Dorm
> treatment room . . . .

Id.; see Def. Ex. F, Declaration of John Greene (Greene Declaration). Notably, Defendant Crawford was not present at the incident, see Def. Ex. T, and was not involved in counseling Sanders or authorizing the cell extraction, see Def. Exs. P; see also Def. Ex. I, Declaration of Nancy Crawford (Crawford Declaration).

It is undisputed that the extraction team pinned Sanders down with a shield on the floor outside the cell, and then pulled him back into the cell. See SAC at 15, ¶¶ 31, 32; Greene, Russell, Lamberson, Jackson, and Powe Declarations. The Defendants explain that Sanders "was pulled back into the cell for restraints to be applied." Greene, Russell, Lamberson, Jackson, and Powe Declarations. Sanders asserts that he "squeezed his body" past the extraction team and "fell on the floor outside of his cell" because he wanted the fixed wing camera in the outer hallway to capture the incident. SAC at 15, ¶ 30. According to Sanders, he believed the

officer holding the handheld camera would point it at Greene's back, and therefore fail to film the forced extraction inside the cell. See id. Contrary to Sanders' belief, Greene signaled to Officer Coronado to follow him inside the cell, so Coronado could film the extraction without obstruction. See Def. Ex. T. The video shows that, while inside the cell, Greene stepped to the side, looked back at Coronado to ensure the camera had an unobstructed view, and never stepped in front of the camera to block its view. See id.

The video evidence is reliable, and provides a chronology of how the incident unfolded. The video does not show any extraction team members or Greene hitting, kicking, or punching Sanders. See id. Rather, it depicts that the five extraction team members pulled Sanders out from underneath his bunk and secured his hands and legs for restraints, with minimal force, as Greene closely watched and supervised. See id. Following Greene's directives, the team carried out "an organized use of force cell extraction" that was necessary to secure Sanders since he continued to resist lawful orders to submit to restraints. Id.

Given the evidence submitted by Defendants, the Court finds they have met their initial burden of showing, by reference to declarations and video evidence, that appropriate and minimal force was used against Sanders. Thus, Sanders is required to present evidence to show that there is a genuine issue for trial; he has

not done so. If this case were to proceed to trial, Sanders would have only his testimony to support his claims. He has not presented any evidence to refute the Defendants' evidence. All the exhibits submitted by Defendants support their position that the cell extraction of Sanders was necessary, and only minimal force was used.

Notwithstanding the ease with which a prisoner can make an excessive force claim, in many excessive force cases the competing testimony of the prisoner and the correctional officers can be enough to defeat summary judgment. However, both the Supreme Court and the Eleventh Circuit have recognized that summary judgment is appropriate in certain scenarios even if there are conflicting versions of events.

> [W]hen "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it," a court should not adopt the contradicted version for purposes of ruling on a motion for summary judgment. <u>Scott</u>, 550 U.S. at 380[9] . . . . This is so because when the non-movant's assertion is "so utterly discredited" by the record, no "genuine" dispute of material fact exists sufficient to prompt an inference on behalf of the non-movant. <u>Id.</u>

<u>Singletary v. Vargas</u>, 804 F.3d 1174, 1183 (11th Cir. 2015); <u>see</u> <u>Perez v. Suszczynski</u>, 809 F.3d 1213, 1221 (11th Cir. 2016) ("[W]hen opposing parties tell two different stories, one of which is

---

[9] <u>Scott v. Harris</u>, 550 U.S. 372 (2007).

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (quotations and citation omitted)).

Here, given the strong and consistent testimony of the corrections officers, see Greene, Russell, Lamberson, Jackson, and Powe Declarations; Def. Exs. P; U, and the reliable video evidence, see Def. Ex. T, showing that the extraction team, with Greene's supervision, secured Sanders with minimal force, and the lack of corroborating evidence to support Sanders' claim, this is the type of case envisioned by the Supreme Court in Scott, 550 U.S. 372, in which summary judgment is appropriate. In light of the evidence presented by Defendants and Sanders' failure to provide any evidence other than his own uncorroborated version, no reasonable jury could find for Sanders under these circumstances surrounding the cell extraction. See generally Goodman v. Kimbrough, 718 F.3d 1325, 1332 (11th Cir. 2013) (recognizing that "to defeat a motion for summary judgment, [the plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; [t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient" (quotations and citation omitted)). As such, Defendants' Motion is due to be granted as to Sanders' Eighth Amendment claims relating to the April 24th cell extraction against

Defendants Greene, Crawford, Powe, Jackson, Russell, Williamson, and Lamberson.

## 2. The May 20, 2014 Incidents

As to the first incident on May 20th, Sanders states that Coates and Stratton advised him that he had to leave his cell for a tuberculosis shot. See SAC at 18, ¶ 54. He admits that he initially refused their directive, but states that he then turned around and submitted to hand restraints. See id. He avers that Stratton placed hand restraints on him, opened the cell door, and gripped his arm so "hard" that he could feel him "shaking" as they waited for the control booth officer to open the door. Id. at 18-19, ¶ 55. Sanders states that Stratton tripped and slammed him on the floor "really hard," when they entered the blind spot outside of H dormitory. Id. at 19, ¶ 56. According to Sanders, Richter and Coates punched, kicked, and hit him in the arms, legs, and back, while Stratton squatted in front of him, banged his head against the floor until he busted Sanders' right eye, and hit him in the arms, legs, and back. See id. He alleges that Greene watched as Stratton, Coates, and Richter beat him. See id.

In the Incident Report (No. 14-6342), Defendant Stratton provided the following narrative, in pertinent part:

> On May 20, 2014 I was assigned as H-Dormitory
> Housing Officer. At approximately 10:06 AM I
> was escorting Inmate Sanders, Christopher DC
> #R24565 solely housed in H3-112 to H-
> Dormitory's Medical Triage Room for the
> purpose of Medical Call-Out. Upon entering the

> Vestibule area in H-Dormitory, Inmate Sanders
> attempted to escape my custodial grasp. I then
> gave Inmate Sanders several verbal orders to
> cease his actions to no avail. As a result of
> Inmate Sander[s'] actions he was redirected to
> the control room wall where he became verbally
> and physically combative. Inmate Sanders was
> then placed on the ground chest first using
> only [a] minimal amount of force necessary to
> bring him into compliance with all orders
> given. Subsequent to physical force being
> utilized I, Officer B. Stratton[,] was
> relieved by Officers A. Cortese and J. Coates.
> . . .

Def. Ex. X at 5, Incident Report; Notice of Filing (Doc. 142), Def. Ex. D, Declaration of Brandon Stratton (Stratton Declaration). Defendants Greene and Coates provide similar accounts and opine that Stratton used only a minimal amount of force to bring Sanders into compliance with Stratton's directives. See Greene Declaration; Def. Ex. Z, Declaration of John Coates (Coates Declaration). Greene declares that Sanders' assertion that he just stood by and watched as Stratton, Richter, and Coates beat him is false. See Greene Declaration. Defendant Richter avers that he was neither involved in any uses of force with Sanders on May 20th nor watched other officers beat Sanders. See Def. Ex. E, Declaration of Charles Richter (Richter Declaration).

Upon review of the record, it appears that the Defendants' Motion is due to be denied as to the first incident on May 20th. Given the parties' conflicting sworn descriptions of the incident, genuine issues of material fact exist as to whether Stratton, Richter, and Coates used an excessive amount of force upon Sanders,

whether Greene watched them do so, and whether the Defendants had previously threatened Sanders with violence. While Sanders and Defendant Stratton agree that Stratton used force, the parties present markedly different accounts regarding whether Stratton used force in a good-faith effort to maintain or restore discipline, or applied it maliciously and sadistically to cause harm. Sanders asserts that Defendants Stratton, Richter, and Coates' alleged assaultive behavior was unnecessary, excessive, and retaliatory and involved kicking, punching, and hitting. In contrast, Stratton maintains that he used only necessary force to restore order, bring Sanders into compliance with his verbal orders, and cease Sanders' combative behavior. <u>See</u> Stratton Declaration.

The United States Supreme Court has acknowledged that the extent of injury to a plaintiff is a factor that may provide some evidence of the amount of force applied and whether the use of force was necessary under the specified circumstances.

> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. <u>Id</u>. at 7, 112 S.Ct. 995.[10] "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." <u>Ibid</u>.(quoting <u>Whitley</u>, 475 U.S. at 321, 106 S.Ct. 1078). The extent of injury may also provide some indication of the amount of force applied. . . .

---

[10] <u>Hudson</u>, 503 U.S. 1.

> Injury and force, however, are only
> imperfectly correlated, and it is the latter
> that ultimately counts. . . .

Wilkins v. Gaddy, 559 U.S. 34, 37-38 (2010) (per curiam). However,

a court ultimately should decide an excessive force claim based on

the nature of the force used rather than the extent of the injury.

Id. at 38.

As previously stated, Sanders asserts that Stratton banged his

head against the floor until he busted Sanders' right eye. See SAC

at 19, ¶ 56. Notably, the video evidence submitted by the

Defendants starts at 10:08 a.m., and memorializes the second

incident involving Sanders spitting on Coates.[11] See Def. Exs. AA;

X at 3 (stating the time on the handheld camera is 10:08 a.m.). As

Coates and Cortese escorted Sanders to the medical clinic after the

first use of force, Sanders turned his head towards Coates to spit.

See Def. Ex. AA. The video captures the right side of Sanders' face

as he turned towards Coates before they forced him to the ground,

and shows that Sanders had a bloody, swollen face just above his

right eye, apparently from the first use of force.[12] See id.

Additionally, the video reflects that, when Cortese and Wainwright

---

[11] See Def. Ex. FF, Videotaped Deposition of Christopher Sanders (Sanders Deposition) at 71 (stating "they cut out [Greene's] introduction to the use of force because it would have showed me laying in a puddle of blood").

[12] See Def. Ex. X at 12 (documenting a laceration/hematoma over his right eye, a deformity to his right shoulder, and a busted lip).

lifted Sanders from the floor after placing the spit shield over his face, there was blood on the floor. See id. The parties offer significantly different accounts of Stratton's use of force, the motivation for Stratton's decision to force Sanders to the ground, and the involvement and motivations of Greene, Richter, and Coates. On this record, the Court finds that there remain genuine issues of material fact with respect to Plaintiff's Eighth Amendment claims relating to the first May 20th incident against Defendants Greene, Stratton, Richter, and Coates. As such, Defendants' Motion is due to be denied.[13]

As to the second incident, Sanders asserts that Defendant Coates (along with Officer Cortese who is not a Defendant) "slammed" him on the floor after Sanders turned and spat at Coates. See SAC at 19, ¶¶ 59, 60. He states that he spat at Coates because Coates squeezed his injured arm. See id. at ¶ 59. Coates declares, in pertinent part:

> Subsequent to physical force being utilized, Defendant Stratton was relieved by Officers A. Cortese and me. . . . Inmate Sanders was assisted to his feet to continue to the Medical Triage Room for a post use of force physical. While in route, Plaintiff

---

[13] "[B]ecause liability can be imposed upon prison guards who are present at the scene and who are in a position to intervene but fail to take reasonable steps to stop excessive force by other guards," see Clark v. Argutto, 221 F. App'x 819, 826 (11th Cir. 2007), and since Sanders' Eighth Amendment failure to intervene claim against Greene is closely intertwined with his excessive use of force claim against Stratton, Richter, and Coates, the Motion will be denied as to the failure to intervene claim.

> expectorated on me, striking me in the face
> and mouth. Inmate Sanders was then placed on
> the ground by Officers A. Cortese and me,
> chest first using only the minimal amount of
> force necessary. While on the ground, Inmate
> Sanders became highly combative and continued
> expectorating in my direction, at which time
> Officer Cortese and I used our body weight to
> control Inmate Sanders. A spit shield was
> placed on Inmate Sanders due to his continuing
> to expectorate at me. Inmate Sanders was then
> escorted to the H-Dorm treatment room and
> evaluated by on duty staff, with noted
> injuries.

Coates Declaration. Defendants Greene and Wainwright provide
similar accounts of what transpired. See Greene Declaration; Notice
of Filing of Exhibit (Doc. 143), Def. Ex. CC, Declaration of Thomas
Wainwright (Wainwright Declaration). Defendant Stratton provided,
in pertinent part, the following narrative in the use of force
report:

> I witnessed Inmate Sanders expectorate in
> Officer J. Coates['] direction striking him in
> the face and mouth. I then witnessed Officers
> Coates and Cortese redirect Inmate Sanders to
> the ground chest first, utilizing their body
> weight to prevent Inmate Sanders from
> continuing his assaultive actions. While on
> the ground inmate Sanders became highly
> combative and continued his assaultive actions
> by continuing to expectorate in Officer
> Coates' direction. I witnessed Officer T.
> Wainwright relieve Officer J. Coates due to
> Officer Coates being exposed to bodily fluids,
> at which time all force ceased by Officer
> Coates. Officer Wainwright placed a spit
> shield on Inmate Sanders due to his continuous
> assaultive behavior toward staff[.] [O]nce the
> spit shield was in place[,] all force ceased
> by Officer A. Cortese.

Def. Ex. X at 1; <u>see</u> Stratton Declaration. Additionally, Wainwright provided similar details in an incident report, and stated that he relieved Coates "due to [Coates'] exposure [to] bodily fluids from Inmate Sanders expectorating on him and placed a spit shield on Inmate Sanders due to his continuous assaultive actions on staff." Def. Ex. X at 9.

Sanders admits, <u>see</u> SAC 19, ¶ 59, and the video evidence confirms, that he spat at Coates, <u>see</u> Def. Ex. AA. Nevertheless, in the video, Sanders denied their accusations that he spat. <u>See</u> <u>id.</u> Additionally, the video evidence shows the following relevant sequence of events that transpired in less than two minutes (10:08 a.m. until 10:10 a.m.): Sanders turned his head towards Coates and spat at Coates; Coates and Cortese immediately forced Sanders to the ground; they used their body weight to steady Sanders and keep him on the ground; Greene verbally directed Sanders to cease his disorderly actions, and keep his face turned away from Coates and Cortese; Sanders stated, "I never spit, sir"; when Cortese had control of Sanders on the ground, Coates walked away from the scene; Greene summoned Wainwright to the scene and asked for a spit shield; Cortese with his gloved hand held Sanders' face down on the ground until Wainwright arrived with the spit shield; Greene directed Wainwright to put the spit shield on Sanders; Sanders repeatedly said that he had a broken bone in his shoulder; Wainwright put the spit shield over Sanders' face; Cortese and

Wainwright followed Greene's directive to help Sanders to his feet, leaving a splattering of blood from Sanders' face on the floor; Greene followed as Cortese and Wainwright escorted Sanders directly to the H dormitory treatment room; and the cameraman announced the time as 10:10 a.m. Id.

That same day, Defendant Coates wrote a DR against Sanders for violation of FDOC Rule 33-601.314, charge 1-11, aggravated assault or attempted aggravated assault on a correctional officer. See Def. Ex. DD, Log # 230-140896. Additionally, the State of Florida criminally charged Sanders with battery for fluids on a corrections officer, and he pled no contest. See Sanders Deposition at 74. The state court sentenced Sanders to a term of imprisonment of fifteen months. See id.; see also http://www.dc.state.fl.us/offenderSearch (Sanders, Christopher, DC Number R24565).

Defendants assert, and this Court agrees, that there remain no genuine issues of material fact with respect to the spitting incident. Given the strong and consistent declarations of the involved Defendants, as well as those who witnessed the incident, the reliable video evidence that depicts how the spitting incident unfolded with a minimal and necessary amount of force, and the lack of corroborating evidence to support Sanders' claim, this is the type of case envisioned by the Supreme Court in Scott, 550 U.S. 372, in which summary judgment is appropriate. In light of the evidence presented by Defendants and Sanders' failure to provide

any evidence other than his own uncorroborated version which is refuted by the video evidence, no reasonable jury could find for Sanders as to this use of force incident. As such, Defendants' Motion is due to be granted as to Sanders' Eighth Amendment claims relating to the second incident against Defendants Greene, Coates, and Wainwright.

Next, Sanders asserts that there was a third excessive use of force that same day. He alleges that Defendants North, Richter, Wainwright, and Markham beat him outside of H dormitory. See SAC at 20, ¶¶ 68, 69; Sanders Deposition at 60, 61. Defendants claim that Officer Davis, with the assistance of Defendant Wainwright, took down and secured Sanders who was "belligerent" during the escort, and Defendant Markham thereafter assisted. Motion at 24. After the incident, Officer Davis wrote a DR against Sanders for violation of FDOC 33-601.314, Rules of Prohibited Conduct, 6-1, disobeying a verbal order. See Def. Ex. EE. In the DR statement of facts, Davis described what transpired and who was involved.

> On May 20, 2014[,] I was assigned to H–
> Dormitory as a Housing Officer [a]t
> approximately 10:34 AM [w]hile escorting
> Inmate Sanders, Christopher DC# R24565 from H–
> Dormitory to Suwannee Correctional Institution
> Main Unit Medical Emergency Room for further
> medical treatment after a prior use of force.
> During the escort in front of H-Dorm Sanders
> became belligerent and attempted to break my
> custodial grasp. I gave several verbal orders
> to cease his disruptive behavior to no avail.
> At this time reactionary physical force was
> necessitated to bring inmate Sanders into
> compliance. I placed Inmate Sanders chest

> first on the ground with the assistance of
> Officer T. Wainwright utilizing only the
> minimal amount of force necessary to bring
> Inmate Sanders into compliance. At this time
> all force ceased. . . .

Id. Defendant North approved the DR.[14] See id. During the investigation, Officer Horne listed the following witnesses: Wainwright, Stratton, Greene, Coates, and Richter. See id. Wainwright provides a similar account of what transpired.

> While Inmate Sanders was being escorted from
> H-Dormitory to the SWCI Main Unit Medical
> Emergency Room after a prior (Use of force
> 14-6342), he became belligerent and attempted
> to break his custodial grasp (Use of force
> 14-6344). Officer Davis gave several orders to
> Inmate Sanders to cease his actions, but to no
> avail. A reactionary use of force became
> necessary to bring Inmate Sanders into
> compliance. Officer Davis placed Inmate
> Sanders chest first onto the ground, with my
> assistance [with] [o]nly the minimal amount of
> force necessary to bring Inmate Sanders into
> compliance. This was captured on video.

> Officers Cortese and Markham can be viewed on
> the video maintaining a custodial hold on
> Inmate Sanders while he was still on the
> ground. Both Officers assisted Inmate Sanders
> to his feet and escorted him back into
> H-Dormitory and directly into the medical
> treatment room. While being escorted back into
> H-Dormitory, Inmate Sanders shouted
> allegations staff were attempting to break his
> wrist. Inmate Sanders was assessed by medical
> staff and then escorted from H-Dormitory to
> the SWCI Main. Once Inmate Sanders was treated
> by the Emergency Room, he was escorted back to
> H-dormitory without further incident.

---

[14] Defendant North did not submit a declaration.

Wainwright Declaration. Defendant Richter declares that he was neither involved in any uses of force with Sanders that day nor watched any other officers beat Sanders nor threatened Sanders with any future violence. <u>See</u> Richter Declaration.

The record before the Court reflects a genuine issue of material fact as to whether Defendants North, Richter, Wainwright, and Markham used excessive force upon Sanders. While Sanders and the Defendants agree that Officer Davis with the assistance of Defendant Wainwright used force, the parties present markedly different accounts regarding whether the force was used in a good-faith effort to maintain or restore discipline, or was applied maliciously and sadistically to cause harm. Sanders asserts that Defendants North, Richter, Wainwright, and Markham's alleged assaultive behavior was unnecessary, excessive, and retaliatory and involved hitting Sanders while he was restrained and still on the ground. <u>See</u> SAC at 20, ¶¶ 67, 68, 69; Sanders Deposition at 60 (stating that "all of them [were] trying to get their free little licks in."). In contrast, Defendants Wainwright and Markham state that Davis and Wainwright used only necessary force to restore order, bring Sanders into compliance with Davis' verbal orders, and cease Sanders' combative behavior. <u>See</u> Def. Ex. QQ, Declaration of Chase Markham (Markham Declaration); Wainwright Declaration. On this record, the Court finds that there remain genuine issues of material fact with respect to Plaintiff's Eighth Amendment claims

relating to the third use of force incident against Defendants North, Richter, Wainwright, and Markham. As such, Defendants' Motion is due to be denied as to Sanders' Eighth Amendment claims relating to the third incident on May 20th against Defendants North, Richter, Wainwright, and Markham.

## B. Conspiracy

Sanders asserts that, after the spitting incident, Defendants Richter, Wainwright, Markham, and Stratton, along with Officers Cortese and Davis, entered an office across from the holding cells and "conspired" to determine who would be the next officer to jump on him. SAC at 20, ¶ 64. Defendants state that "[a] review of Exhibit BB shows that no such meeting occurred." Motion at 25. The Eleventh Circuit stated:

> Conspiring to violate another person's constitutional rights violates section 1983. Dennis v. Sparks, 449 U.S. 24, 27 101 S.Ct. 183, 186 (1980); Strength v. Hubert, 854 F.2d 421, 425 (11th Cir. 1988), overruled in part on other grounds by Whiting v. Traylor, 85 F.3d 581, 584 n.4 (11th Cir. 1996). To establish a prima facie case of section 1983 conspiracy, a plaintiff must show, among other things, that the defendants "reached an understanding to violate [his] rights." Strength, 854 F.2d at 425 (quotation omitted). The plaintiff does not have to produce a "smoking gun" to establish the "understanding" or "willful participation" required to show a conspiracy, Bendiburg v. Dempsey, 909 F.2d 463, 469 (11th Cir. 1990), but must show some evidence of agreement between the defendants. Bailey v. Bd. of County Comm'rs of Alachua County, 956 F.2d 1112, 1122 (11th Cir. 1992) ("The linchpin for conspiracy is agreement, which presupposes communication."). For a

> conspiracy claim to survive a motion for
> summary judgment "[a] mere 'scintilla' of
> evidence . . . will not suffice; there must be
> enough of a showing that the jury could
> reasonably find for that party." <u>Walker v.</u>
> <u>Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990).

<u>Rowe v. City of Fort Lauderdale</u>, 279 F.3d 1271, 1283-84 (11th Cir. 2002).

The fixed wing video evidence referenced by Defendants, <u>see</u> Def. Ex. BB, depicts the escort of Sanders to cell H-3112 after the spitting incident, and shows Defendant Greene as he read a statement relating to the "reactionary use of force," <u>see</u> <u>id.</u>; <u>see</u> <u>also</u> Def. Ex. AA. The fixed wing video concludes at 10:20 a.m. <u>See</u> Def. Ex. BB. In his deposition, Sanders stated that he did not recall how long he was left in the cell before the Defendants returned to pull him out for another escort. <u>See</u> Sanders Deposition at 59. The third use of force incident began at 10:34 a.m. <u>See</u> Def. Ex. EE. The fixed wing video evidence does not resolve the issue as to whether the Defendants met before the third incident, and if so, whether their meeting was administrative in nature to select the officers who would escort Sanders without incident or to conspire about using unnecessary force against Sanders during the next escort.

In his declaration in response to Defendants' Motion, Sanders states that Defendants Richter, Wainwright, Markham, and Stratton went into an office "to figure out who was going to jump on [him] next." Response at 7, ¶ 58. In his deposition, Sanders stated that

he could hear the officers talking about "[w]ho was going to escort [him] up there to medical and what they wanted them to do." Sanders Deposition at 59. Also, in response to a question asking what the Defendants "[said] they wanted to do," Sanders answered

> I don't remember specifically. It was something to the extent of, like, it really wasn't anything specific, it was something, like, **you already know what time it is. Who is escorting him.**

Id. at 60 (emphasis added). Defendants deny Sanders' assertion that they conspired after the spitting incident to use unnecessary force against Sanders. See Richter, Wainwright, Markham, and Stratton Declarations. Notably, for Sanders' conspiracy claim to survive Defendants' request for summary judgment, a mere scintilla of evidence will not be sufficient. Instead, "there must be enough of a showing that the jury could reasonably find for [Sanders]." See Rowe, 279 F.3d at 1284 (citation omitted). Sanders has neither shown that Defendants Richter, Wainwright, Markham, and Stratton reached an agreement to use unnecessary force against him nor provided some evidence that a jury could reasonably find for him at trial. As such, Defendants' Motion is due to be granted as to Sanders' conspiracy claim against Defendants Richter, Wainwright, Markham, and Stratton.

## C. First Amendment Retaliation

Sanders states that the Defendants violated his First Amendment right when they retaliated against him for complaining to

his mother and filing grievances about staff abuse and conditions of confinement. He asserts the following retaliatory acts: (1) Riegel wrote a false DR on April 12th; (2) Richter and Riegel unlawfully placed him on property restriction, and forced him to sleep on a steel bunk without a mattress on April 12th; (3) Capen wrote two false DRs on April 18th; (4) Capen and Robertson, under Crawford's direction, unlawfully placed him on property restriction on April 18th; (5) Robertson used excessive force against him;[15] (6) Richter, Stratton, Greene, and Coates deprived him of several meals, threatened him with physical violence, and used excessive force against him; and (7) Gartman and Mock threatened him with physical violence. <u>See</u> SAC at 10, 25-38. Defendants assert that Sanders was found guilty of the disciplinary charges based on sufficient evidence after a hearing on each DR, for which he was afforded procedural due process of law. As a result, they contend that Sanders cannot establish a retaliation claim when he violated FDOC rules, and the disciplinary team found him guilty of the disciplinary charges due to misconduct, not as a result of his submission of earlier grievances and complaints about his conditions of confinement. <u>See</u> Motion at 13-16.

"The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." <u>Farrow v. West</u>, 320 F.3d 1235, 1248 (11th Cir. 2003). "It is an

---

[15] <u>See</u> SAC at 14, ¶ 20.

established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008) (citing Farrow, 320 F.3d at 1248). An inmate may maintain a cause of action for retaliation under 42 U.S.C. § 1983 by showing that a prison official's actions were "the result of [the prisoner] having filed a grievance concerning the conditions of his imprisonment." Farrow, 320 F.3d at 1248 (quotation marks omitted).

As relevant to this action, the Eleventh Circuit set forth the standard applicable to a First Amendment retaliation case.

> To prove First Amendment retaliation, an inmate must show that: (1) his speech or act was constitutionally protected, (2) he suffered an adverse action from prison officials that would deter a person of ordinary firmness from engaging in the speech or act, and (3) the protected speech or act and adverse action were causally connected. Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008); see Moton v. Cowart, 631 F.3d 1337, 1342 (11th Cir. 2011) ("An inmate must establish ... 'his speech or act was constitutionally protected....'"). We've routinely held that a prisoner's complaints about prison conditions, via administrative grievances, lawsuits, and the like are protected under the First Amendment. Smith, 532 F.3d at 1276 (addressing grievances about the conditions of imprisonment); Al-Amin v. Smith, 511 F.3d 1317, 1333-34 (11th Cir. 2008) (addressing a prison's opening of mail from attorneys outside the inmate's presence).

Hollins v. Samuals, 540 F. App'x 937, 938-39 (11th Cir. 2013) (per curiam).

Notably, there must be a causal relationship between the retaliatory action (disciplinary punishment) and the protected speech (filing grievances). The Eleventh Circuit has addressed an inmate's claim for retaliation against prison officials in the disciplinary context.

> If a prisoner is found guilty of an actual disciplinary infraction after being afforded due process and there was evidence to support the disciplinary panel's fact finding,[16] the prisoner cannot later state a retaliation claim against the prison employee who reported the infraction in a disciplinary report. Whether an inmate actually committed the charged infraction or whether the disciplinary report falsely accuses the inmate are questions of fact that are decided by the disciplinary panel. In the particular circumstances here, [the plaintiff] has suffered adverse action (here 30 days' disciplinary confinement) because he actually violated the prison rules and not because of his earlier grievances. To find otherwise would render the prison disciplinary system impotent by inviting prisoners to petition the courts for a full retrial each time they are found guilty of an actual disciplinary infraction after having filed a grievance. Because he was guilty of the disciplinary charges resulting in the disciplinary harm at issue, [plaintiff]'s retaliation claim fails.

O'Bryant v. Finch, 637 F.3d 1207, 1215-16 (11th Cir. 2011) (per curiam) (footnote omitted). Thus, an inmate cannot state a claim of

---

[16] See Wolff v. McDonnell, 418 U.S. 539 (1974); Superintendent v. Hill, 472 U.S. 445 (1985).

retaliation for a disciplinary charge involving a prison rule infraction when the inmate was found guilty of the actual behavior underlying that charge after being afforded adequate due process. See id. at 1215. In other words, there is no causal connection between a DR and a prisoner's freedom of speech if the disciplinary action would have been taken regardless of the prisoner's protected speech. Id. at 1217 (citing Smith, 532 F.3d at 1278, n.22). "Any possible causal connection between the protected activity (the grievances) and the harm (the disciplinary charges and sanctions) is severed since the harm is not in reaction to any protected activity, but directly due to an improper activity." Id. at 1219-20.

Sanders asserts that the Defendants retaliated against him for filing earlier grievances when they fabricated facts underlying several DRs. He states that Defendant Riegel wrote a DR for misuse of state property on April 12th.[17] He also states that, on that same day, Richter and Riegel unlawfully placed him on property restriction, and forced him to sleep on a steel bunk without a mattress. Defendant Riegel provides a declaration in support of his request for summary judgment, and describes the circumstances that

---

[17] Sanders states that, during "all times relevant to this case," he was housed in the inpatient mental health transitional care unit in H dormitory at SCI. SAC at 10, ¶ 1. Undoubtedly, Sanders "has an extensive history of mental health disorders" that mental health professionals have evaluated and treated over several years. See Def. Ex. MM at 2, ¶ 8.

led to issuance of the DR and property restriction on April 12th.

> On April 12, 2014, at approximately 7:45 pm, I was assigned as the H-Dormitory Housing Sergeant. I was conducting showers and cell searches on Quad #2 of H-Dormitory. I searched Inmate Sanders cell, H2-211, and found a fishing line, which appeared to be made from the thread of a state issued white sheet. I noticed Inmate Sanders personal property, to include his personal letters, in complete disarray under his assigned bunk. I issued Inmate Sanders a disciplinary report for violation of Fla. Admin. Code 33-601.314 (7-4) misuse of state property or property and failure to maintain his cell.
>
> As a result, [Sanders] was placed on 72-hour property restriction.

Def. Ex. A, Declaration of Arthur Riegel (Riegel Declaration). As a result of Sanders' failure to comply with a prison rule, Riegel wrote a DR for misuse of state property. <u>See</u> Def. Ex. B, DR, Log # 230-140618. The DR statement of facts provides, in pertinent part:

> Inmate Sanders will be placed on 72 hour property restriction to prevent any further issues. [He] will remain on his current status pending the disposition of a disciplinary report hearing.

<u>Id.</u> The DR, worksheet, and memorandum to mental health,[18] <u>see id.</u>, establish that the prison officials complied with the requirements of <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974), and <u>Superintendent v. Hill</u>, 472 U.S. 445 (1985). Sanders received written notice of the

---

[18] Defendant Meeks affirmed: "It does not appear [Sanders'] mental condition substantially contributed to the alleged offense or significantly hinders [his] participation in the disciplinary process." <u>See</u> Def. Ex. B, Disciplinary Team Mental Health Consultation, dated April 12, 2014.

charges against him. See _Wolff_, 418 U.S. at 563 (requiring advance written notice of charges). He had the opportunity to present evidence and witnesses. See _id._ at 566 (stating that prisoners should be allowed to call witnesses and present evidence as long as it does not interfere with institutional safety or legitimate correctional goals). He also received written statements of the findings against him and the evidence relied upon by the disciplinary team. See _id._ at 563 (requiring that a factfinder give the prisoner written notice of evidence relied on and reasons for disciplinary action). Riegel's statement and the photograph of the "fishing line" constituted evidence before the disciplinary team that supported the team's decision. See _Hill_, 472 U.S. at 456 (finding that the prison disciplinary panel complied with due process requirements when convicting the inmate based on oral testimony and a written report by the prison guard).

Additionally, Sanders asserts that Defendant Capen wrote two false DRs on April 18th. He also states that Defendants Capen and Robertson, under Defendant Crawford's direction, unlawfully placed him on property restriction. Defendant Robertson submitted a declaration, stating in pertinent part:

> I have also reviewed the two attached disciplinary reports issued to inmate Sanders based on incidents that occurred on April 18, 2014 at Suwannee Correctional Institution. **I was not involved in either of the two incidents that lead to the issuing of these disciplinary reports. My name is Chad Robertson and the person involved in the**

> **incidents was Sgt. J. Robertson,** See
> Disciplinary Report No. 230-140673 and Log
> #230-140674.[19]

Def. Ex. J, Declaration of Chad Robertson (Robertson Declaration)

(emphasis added). Notably, Sanders names Chad Robertson as a

Defendant. <u>See</u> SAC at 1, 7. In response to Defendants' Motion,

Sanders admits that Defendant Chad Robertson was not involved. <u>See</u>

Response at 3, ¶ 14; <u>see also</u> Def. Exs. H; L (showing that Sergeant

J. Robertson witnessed both instances of Sanders' misconduct). As

such, Defendants' Motion is due to be granted as to Sanders'

retaliation claims against Defendant Chad Robertson since Sanders

acknowledges that he mistakenly named him as a Defendant.

Defendant Capen also provides a declaration and describes the

factual circumstances underlying the issuance of the April 18th DRs

at issue.

> Inmate Sanders alleges that on April 18, 2014,
> Lt. Crawford had Defendant Robertson and I
> pulled [sic] him from his cell and place him
> on property restriction for no reason and
> under the pretense that Plaintiff was being
> removed for a cell search, and that his cell
> was the only one searched. Inmate Sanders also
> alleges that once he was placed back into his
> cell, Defendant Robertson and I refused to
> take off his cuffs and tried to enter his cell
> and pretend he was trying to keep the cuffs.
> Inmate Sanders alleges that Defendant
> Robertson called Defendant Kelly and reported
> that he was refusing to give up his cuffs and
> had he not yelled into the camera that he was
> not refusing to come out, Defendants Kelly,
> Robertson, and I would have used the cell

---

[19] <u>See</u> Def. Exs. H; L.

> extraction team to jump on him. These
> allegations are untrue.
>
> On April 18, 2014 at approximately 11:00 p.m.,
> while assigned to H-dormitory, a random search
> of cell H2-211 on Quad 2 was conducted. The
> cell solely houses inmate Sanders, Christopher
> DC# R24565. Inmate Sanders stated, "you
> fu**ing crackers ain't taking my shit to Lt.
> Crawford". He was issued a disciplinary report
> for a violation of Fla. Admin. Code R.
> 33-601.314 (1-4). Disrespect to Officials.[20]
>
> On April 18, 2014 at approximately 11:00 p.m.,
> I was conducting a random cell search on quad
> 2 of cell H2-211. I observed a food service
> cup and spork, and Inmate Sanders' personal
> papers covering the cell vent. Inmate Sanders
> was issued a disciplinary report for a
> violation of Fla. Admin. Code R. 33-601.314
> (7-4) misuse of state property. Plaintiff was
> placed on property restriction.[21]

Def. Ex. K, Declaration of Demetri Capen (Capen Declaration);

Crawford Declaration. The DRs, see Def. Exs. H, No. 230-140673; L,

No. 230-140674, establish that the prison officials complied with

the requirements of Wolff, 418 U.S. 539, and Hill, 472 U.S. 445.

The disciplinary team found him guilty of violating FDOC rules

based on Capen's statements and observations along with a

photograph of the food service cup and spork.

The record reflects that the Defendants wrote the DRs and

placed Sanders on property restriction because he violated the FDOC

rules, and the disciplinary team ultimately found him guilty based

---

[20] See Def. Ex. H.

[21] See Def. Ex. L.

on witness statements and other evidence. On this record, the protected speech (filing grievances) and adverse actions (disciplinary punishment and property restriction) were not causally connected. As such, Defendants' Motion is due to be granted as to Sanders' retaliation claims against Defendants Richter, Riegel, Crawford, Robertson and Capen. Moreover, to the extent Sanders asserts that the Defendants retaliated against him for filing grievances when they either wrote other DRs during the relevant time period or were involved in the incidents underlying the basis for the those DRs,[22] Defendants' Motion is due to be granted.

Additionally, Sanders asserts that Defendants Greene, Coates, Richter, and Stratton retaliated against him when they sporadically deprived him of several meals, threatened him with physical violence, and used excessive force against him. He states that Richter and Stratton denied him lunch and dinner on April 12th. See SAC at 11, ¶ 8. He also alleges that Greene and Coates deprived him of several meals from April 25th through May 11th. See id. at 16,

_____

[22] See Def. Exs. G (involving Defendant Riegel); M (concerning the April 21st misuse of state property, and Defendants Richter and Greene); N (regarding the April 24th misuse of state property, the cell extraction, and Defendants Russell and Greene); Y-1, Y-2 (relating to Defendant Richter placing a magnet over his window on April 21st due to his lewd and lascivious behavior in front of Defendant Bridges on April 17th); DD (pertaining to the May 20th spitting incident and Defendant Coates); EE (relating to the May 20th incident, and Defendants North, Richter, Wainwright, Stratton, Greene, and Coates).

¶ 37. Defendants address Sanders' assertions as an Eighth Amendment claim instead of one arising under the First Amendment. See Motion at 32-34. They flatly deny that they refused to feed Sanders. See Greene, Coates, Richter, and Stratton Declarations. In response to the Motion, Sanders asserts that there is a genuine issue of material fact as to whether Defendants Greene, Coates, Richter, and Stratton refused to feed him several meals from April 12, 2014, until May 11, 2014. See Response at 2, ¶ 15. This Court agrees. Sanders swears in his verified SAC that the Defendants denied him meals. Additionally, in his deposition, Sanders testified that they refused him meals "every time their shift was working." Sanders Deposition at 5. In light of the conflicting evidence, Defendants' Motion is due to be denied as to Sanders' retaliation claims relating to food deprivation against Defendants Greene, Coates, Richter, and Stratton.

Next, Sanders alleges that Defendant Mock, as an Assistant Warden, retaliated against him for filing grievances when he threatened to place Sanders on property restriction. See SAC at 32-33, ¶ 32. According to Sanders, when he tried to inform Mock about staff abuse on April 17th, Mock "told Sanders he'd better get off the door before he has him put on property restriction." Id. at 13, ¶ 14. Sanders also asserts that Defendant Gartman, as an Assistant Warden, retaliated against him for filing grievances when she threatened him with physical violence. See id. at 28, ¶ 14. Neither

Gartman nor Mock submitted a declaration in support of their request for summary judgment. At this stage of the proceedings, to the extent the facts are disputed, the Court must accept Sanders' statements as the facts. Thus, accepting Sanders' sworn allegations as true, Defendants' Motion is due to be denied as to Sanders' retaliation claims against Defendants Gartman and Mock.

## D. Property Deprivation and Cell Search

Sanders asserts that Richter, Crawford, Riegel, Robertson, and Capen deprived him of his property. See SAC at 33-35, ¶¶ 36-42. Defendants contend that "[a] state employee's unauthorized intentional deprivation of an inmate's property does not violate due process under the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Motion at 18 (citing Hudson v. Palmer, 468 U.S. 517, 533 (1984)). Insofar as Sanders asserts that the Defendants deprived him of due process by taking his property, it is well-settled that the Due Process Clause is not offended when a state employee intentionally deprives a prisoner of his property as long as the State provides him with a meaningful post-deprivation remedy. See Hudson, 468 U.S. at 533; Jackson v. Hill, 569 F. App'x 697, 698 (11th Cir. 2014); Taylor v. McSwain, 335 F. App'x 32, 34 (11th Cir. 2009) ("Regarding deprivation of property, a state employee's unauthorized intentional deprivation of an inmate's property does not violate due process under the Fourteenth Amendment if a meaningful

postdeprivation remedy for the loss is available."). Sanders has an available, adequate post-deprivation remedy under state law. "Under Florida law, [a plaintiff] can sue the officers for the conversion of his personal property." Jackson, 569 F. App'x at 698 (citing Case v. Eslinger, 555 F.3d 1317, 1331 (11th Cir. 2009)). Moreover, any assertion that the Defendants were negligent when they failed to ensure that his property was replaced or returned does not rise to the level of a Fourteenth Amendment violation. See Maddox v. Stephens, 727 F.3d 1109, 1119 (11th Cir. 2013) (stating mere negligence does not rise to the level of a substantive due process violation).

Additionally, Sanders asserts that Defendants Robertson and Capen violated his Fourth Amendment right when they randomly searched his cell on April 18th. See SAC at 35-36, ¶¶ 43, 44. Imprisonment necessarily curtails the enjoyment of some significant constitutional rights as institutional security needs must be balanced with retained rights. See Bell v. Wolfish, 441 U.S. 520, 545-46 (1979); Sandin v. Conner, 515 U.S. 472, 485 (1995) ("[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.") (quoting Price v. Johnston, 334 U.S. 266, 285 (1948) (overruled on other grounds by McCleskey v. Zant, 499 U.S. 467 (1991)). Nevertheless, inmates retain those rights that are "not inconsistent with [their] status

as . . . prisoner[s] or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974) (quoted in Hudson, 468 U.S. at 523).

In Hudson, the Court stated, in pertinent part:

> [W]e hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.

468 U.S. at 525-26. In so holding, the Court recognized that the "administration of a prison . . . is 'at best an extraordinarily difficult undertaking.'" Id. at 527 (citing Wolff, 418 U.S. at 566). Thus, the Court balanced two competing interests: "the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell." Id. The Court concluded: "We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security." Id. at 528. Notably, the Court stated that "wholly random searches are essential to the effective security of penal institutions." Id. at 529. Consistent with this authority, Defendants' Motion is due to be granted as to Sanders' Fourth and Fourteenth Amendment claims

relating to property deprivation and the April 18th cell search against Defendants Richter, Crawford, Riegel, Robertson, and Capen.

## E. Eleventh Amendment Immunity

To the extent Defendants assert that they are entitled to Eleventh Amendment immunity, this Court agrees.

> The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. It is well established that, in the absence of consent, "a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." Papasan v. Allain, 478 U.S. 265, 276, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (quotation omitted). The Eleventh Amendment also prohibits suits against state officials where the state is the real party in interest, such that a plaintiff could not sue to have a state officer pay funds directly from the state treasury for the wrongful acts of the state. Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1336 (11th Cir. 1999). . . .

Hayes v. Sec'y, Fla. Dep't of Children & Families, 563 F. App'x 701, 703 (11th Cir. 2014) (per curiam).

In Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir. 1986) (per curium), the Eleventh Circuit noted:

> It is clear that Congress did not intend to abrogate a state's eleventh amendment immunity in section 1983 damage suits. Quern v. Jordan, 440 U.S. 332, 340-45, 99 S.Ct. 1139, 1144-45, 59 L.Ed.2d 358 (1979). Furthermore, after reviewing specific provisions of the Florida statutes, we recently concluded that Florida's limited

> waiver of sovereign immunity was not intended
> to encompass section 1983 suits for damages.
> See Gamble,[23] 779 F.2d at 1513-20.

Accordingly, in Zatler, the court found that the FDOC Secretary was immune from suit in his official capacity. Id. Insofar as Sanders may be seeking monetary damages from the Defendants in their official capacities, the Eleventh Amendment bars suit. Therefore, Defendants' Motion is due to be granted as to Sanders' claims for monetary damages from them in their official capacities.

### F. Evidence Tampering

Sanders asserts that Defendant Howard, as an FDOC Inspector, violated his First Amendment right because he tampered with the use of force video, and therefore, "blocked" Sanders from being able to show how Defendant Richter assaulted him. SAC at 40, ¶ 7. He states that Howard "manipulated" the video "to start when [Sanders] was already on his feet" after Defendants Richter, Coates, and Stratton had "jumped" him. Id. at 23, ¶ 91. In Defendant Howard's declaration, he avers that Sanders' assertions "are not true." See Def. Ex. II, Declaration of Brad Howard.

As previously discussed in Section IV. A. 2., the video evidence memorializes the second incident involving Sanders spitting on Coates. See Def. Exs. AA. Nevertheless, the video still captures the right side of Sanders' face as he turned towards

---

[23] Gamble v. Fla. Dep't of Health & Rehab. Serv., 779 F.2d 1509 (11th Cir. 1986).

Coates before Cortese and Coates forced him to the ground. <u>See</u> <u>id.</u>
It reflects that Sanders suffered a bloody, swollen face just above
his right eye, apparently from the first use of force involving
Richter, Coates, and Stratton. <u>See</u> <u>id.</u> Additionally, the video
shows that, when Cortese and Wainwright lifted Sanders from the
floor after placing the spit shield over his face, there was blood
on the floor.

Notably, Sanders acknowledges that an officer arrived with a
handheld camera <u>after</u> Richter, Coates, and Stratton's use of force
upon him, and <u>before</u> the second incident involving Coates and
Cortese. <u>See</u> SAC at 19, ¶¶ 56, 57, 58; <u>see</u> <u>also</u> Sanders' Deposition
at 71. On this record, there are no genuine issues of material fact
in that the parties agree that the cameraman started to film
Coates' escort of Sanders after the first incident. Any assertion
that Defendant Howard "blocked" Sanders' ability to prove the first
use of force is unfounded. Howard has not infringed upon Sanders'
First Amendment right in that Sanders was neither denied access to
the courts to present his claim nor the prison's grievance
procedure to address his assertions that the Defendants used an
excessive amount of force. As such, Defendants' Motion is due to be
granted as to Sanders' First Amendment claim that Defendant Howard
tampered with the evidence.

## G. Eighth Amendment Failure to Protect

Sanders asserts that Defendants Gartman, Mock, Landrum, Crews, and Beasley failed to protect him from physical harm when he notified them that his life and well being were in danger. See SAC at 39, ¶ 2. Defendants assert they were unaware of a substantial danger of physical harm from SCI staff because Sanders neither spoke with them about verbal threats from staff nor "placed anyone on notice that a substantial risk of serious harm exists and most importantly, that the inference was drawn." See Motion at 28, 26-28. In response to the Motion, Sanders suggests that there remain genuine issues of material fact as to whether the Defendants' subjective knowledge of a substantial risk of harm could be inferred from the facts: he filed multiple grievances informing them that he was threatened with physical harm and retaliated against for filing grievances. See Response, Doc. 137-1, at 2, ¶¶ 20, 21.

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994). It is "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [that] violates the Eighth Amendment." Id. at 828 (citations omitted). The deliberate indifference standard requires the plaintiff to demonstrate that the prison official "was

subjectively aware" of a risk of harm; mere negligence is not sufficient. Id. at 829, 835-36.

> A prison official violates the Eighth Amendment "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (quotation marks omitted and alterations adopted) (emphasis added). To survive summary judgment on a failure-to-protect claim under the Eighth Amendment, "a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Goodman, 718 F.3d at 1331 (quotation marks omitted).[24]

> "The second element—that [a prison official] evidenced a deliberate indifference to a serious risk that [a prisoner] would be injured—forms the crux of the matter at hand." Id. The prison official must "actually (subjectively) know[] that an inmate is facing a substantial risk of serious harm, yet disregard[] that known risk by failing to respond to it in an (objectively) reasonable manner." Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 617 (11th Cir. 2007). With regard to the subjective component of the defendant's actual knowledge, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S.Ct. at 1979.

> Moreover, this must be shown by "conduct that is more than gross negligence." Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010). "[T]he deliberate indifference standard—and the subjective awareness required by it—is far more onerous than normal

_____

[24] Goodman v. Kimbrough, 718 F.3d 1325 (11th Cir. 2013).

tort-based standards of conduct sounding in
negligence: 'Merely negligent failure to
protect an inmate from attack does not justify
liability under [§] 1983.'" <u>Goodman</u>, 718 F.3d
at 1332 (quoting <u>Brown v. Hughes</u>, 894 F.2d
1533, 1537 (11th Cir. 1990)).

<u>Losey v. Thompson</u>, 596 F. App'x 783, 788-89 (11th Cir. 2015).

Thus, to establish an Eighth Amendment violation, an inmate
must show that a prison official "actually (subjectively) knows
that an inmate is facing a substantial risk of serious harm, yet
disregards that known risk by failing to respond to it in an
(objectively) reasonable manner." <u>Rodriquez v. Sec'y for Dep't of
Corr.</u>, 508 F.3d 611, 617 (11th Cir. 2007) (citing <u>Farmer</u>, 511 U.S.
at 837, 844) (footnote omitted). "The known risk of injury must be
a 'strong likelihood, rather than a mere possibility' before a
guard's failure to act can constitute deliberate indifference."
<u>Brown v. Hughes</u>, 894 F. 2d 1533, 1537 (11th Cir. 1990).

Prison officials may avoid Eighth Amendment liability in one
of three ways: (1) showing that they were not aware "of the
underlying facts indicating a sufficiently substantial danger and
that they were therefore unaware of a danger"; (2) admitting
awareness of "the underlying facts" of a substantial danger, but
believing the danger was "insubstantial or nonexistent"; or (3)
showing they responded reasonably to a known substantial danger.
<u>Rodriquez</u>, 508 F.3d at 617-18 (quoting <u>Farmer</u>, 511 U.S. at 844)
(internal quotations omitted).

In this case, Defendants Gartman, Mock, Landrum, Crews, and Beasley rely on the first method: they assert they were unaware of a substantial danger of physical harm from SCI staff because Sanders neither spoke with them about the verbal threats from staff nor "placed anyone on notice that a substantial risk of serious harm exits and most importantly, that the inference was drawn." <u>See</u> Motion at 28, 26-28. Thus, the subjective knowledge requirement is at issue. To satisfy the subjective knowledge requirement, a plaintiff must show that a prison official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." <u>Farmer</u>, 511 U.S. at 837. Whether a prison official "had the requisite knowledge of a substantial risk is a <u>question of fact</u> subject to demonstration in the usual ways, including inference from the circumstantial evidence." <u>Rodriquez</u>, 508 F.3d at 617 (emphasis in original).

As to Defendant Gartman, Sanders asserts that she failed to protect him from "the illegal actions" committed by Defendants Coates, Greene, Richter, Crawford, Russell, Williamson, Lamberson, Powe, North, Jackson, Robertson, Capen, Riegel, and Stratton. SAC at 28, ¶ 13; 31, ¶ 26. Sanders states that he and his mother informed Gartman about the alleged abuse leading up to the physical assaults. According to Sanders, he informed his mother by written correspondence about the events that had transpired in early April

2014, see id. at 13, ¶ 15; his mother spoke with Gartman on April 18th, and informed Gartman about the abuse, see id.; and Gartman had Lieutenant Woods pull Sanders out of his cell, and had Nurse Murphy check Sanders, see id. at ¶¶ 16, 17. Sanders further asserts that, on April 20th, he spoke with Gartman and informed her that Richter and Stratton said they were going to jump on him. See id. at 14, ¶22. Sanders states that Gartman told him that "he was lucky" she did not run the cell extraction team and that he was at SCI where "they kick ass." Id. According to Sanders, he again spoke with Gartman on May 5th about how Richter, Stratton, and Coates refused to feed him, and how Green directed Coates to put empty trays in his food box; however, she told him she did not care. See id. at 16-17, ¶¶ 42, 43.

Next, Sanders asserts that Defendant Mock failed to protect him from Defendants Stratton and Richter who had threatened to harm him. He states that, on April 17th, he "tried to [verbally] inform" Mock about "what was going on," but Mock told him he "better get off the door" or he would have him placed on property restriction. SAC at 13, ¶ 14. According to Sanders, he informed Mock about the specific threats by Defendants Stratton, Richter, and Coates. See P. Ex., Doc. 137-8 at 14 (May 11, 2014 grievance), 13 (Acting Warden Mock referring the issue to the Office of the Inspector General on May 14th).

Neither Gartman nor Mock submitted a declaration in support of the request for summary judgment. The question before the Court at summary judgment is not whether Sanders in fact reported the alleged threats to Gartman and Mock that ultimately led to Defendants Stratton, Richter, and Coates' alleged excessive use of force (1st May 20th incident), and Defendants North, Richter, Wainwright, and Markham's alleged excessive use of force (3rd May 20th incident). Sanders has sworn that he did inform Gartman and Mock about the specific threats and has also sworn to the substance of the information he provided to them. At this stage of the proceedings, the Court must accept Sanders' statements as the facts. On this record, drawing all inferences in favor of Sanders, as the Court must, Sanders' reported threats to Gartman and Mock were sufficient to impute to them knowledge of a substantial risk of serious harm to Sanders. Thus, accepting Sanders' sworn allegations as true, Defendants' Motion is due to be denied as to Sanders' failure to protect claims against Defendants Gartman and Mock.[25]

Additionally, Sanders maintains that Defendants Landrum, Crews, and Beasley failed to protect him from the Defendants'

---

[25] Sanders' assertions as to Gartman and Mock are interwoven with Sanders' claims of excessive use of force (the first and third uses of force on May 20th) against Defendants Stratton, Richter, Coates, North, Wainwright, and Markham, and retaliation claims against Defendants Greene, Coates, Richter, and Stratton for the alleged denial of meal trays.

abuse, <u>see</u> SAC at 31-32, ¶¶ 27, 28, 30, when they were fully aware about the specific threats through Sanders' submission of multiple grievances, <u>see</u> Sanders Deposition at 52, 68. As to Landrum, Sanders states that, on April 15th, he submitted a grievance of an emergency nature to Landrum, <u>see</u> P. Ex., Doc. 137-7 at 3-4, and Landrum responded that he had forwarded it to Inspector Beasley; however, Sanders was never interviewed, and nothing was done to remedy the injustices, <u>see</u> SAC at 13, ¶ 11. According to Sanders, he yelled to a handheld camera on April 18th about staff threats, but after reviewing the use of force camera, Landrum never helped him. <u>See</u> <u>id.</u> at 14, ¶ 21. Additionally, he states that, on May 11th, he wrote an emergency grievance to Landrum, <u>see</u> P. Ex., Doc. 137-8 at 14, but he did not get a response until after Richter, Stratton, Coates, Markham, North, Wainwright, and Greene assaulted him on May 20th, <u>see</u> SAC at 18, ¶ 53; 23, ¶ 85. Landrum avers, in pertinent part:

> I was never made aware of any abuse of inmate Sanders, nor was I aware of any discussions with inmate Sanders' mother by staff at Suwannee Correctional Institution. Any grievances by inmate Sanders would have been addressed by staff at Suwannee CI.
>
> I did sign off on a grievance that was being referred to the Inspector General for investigation, Grievance Log number 1404-230-184, wherein Inmate Sanders says he was physically and mentally abused.[26] The grievance was referred to the Inspector

---

[26] <u>See</u> P. Ex., Doc. 137-7 at 8, 9.

> General's Office and contained an allegation
> of physical abuse but no factual basis to
> support the allegation.[27] As the Warden, it
> was my duty to review videos associated with
> uses of force, however it was not routine for
> me to review fixed wing videos, absent a use
> of force.

Def. Ex. PP, Declaration of Christopher Landrum (Landrum Declaration). Sanders maintains that he never spoke to Landrum about the abuse, but notified him about the ongoing misconduct through the submission of grievances. See Sanders Deposition at 52. In response to Defendants' Motion, Sanders submitted grievances that he addressed to Landrum concerning retaliatory conduct and specific threats by Riegel, Richter, Greene, Coates, and Stratton. See P. Ex., Doc. 137-7 at 3-5, 6-7, 8-9; 137-8 at 13-14.

As to Defendant Crews, Sanders asserts that when Coates continued to put empty trays in his food box, Sanders' mother called the FDOC Secretary's office and filed a complaint. See SAC at 17, ¶ 44. He also states that he submitted an emergency grievance to Crews on May 11th about threats by Richter, Coates, and Stratton.[28] See id. at 18, ¶ 53; 23, ¶ 85; see also P. Ex., Doc. 137-8 at 5, 6, 23, 24; Sanders Deposition at 52. Defendant Crews states, in pertinent part:

---

[27] See P. Ex., Doc. 137-7 at 8.

[28] Sanders asserts that he submitted a grievance to Defendant Crews on May 28th, and informed him about the May 20th uses of force. See SAC at 22, ¶ 82; see also P. Ex., Doc. 137-8 at 23.

I was never aware of any abuse of inmate
Sanders, nor was I aware of any discussions
with inmate Sanders' mother by staff at
Suwannee Correctional Institution.

Additionally, I am not aware of any
conversation that I had with inmate Sanders'
mother. In the event that someone was
contacted about inmate abuse at an
institution, this is what would occur. This
information would be forwarded to the housing
institution and the Office of the Inspector
General for follow-up and determination as to
whether additional action was required.
Additionally, I did not personal[ly] review
grievances. They were reviewed by the
Department of Corrections, Office of Grievance
Appeals.[29]

Def. Ex. HH, Declaration of Michael Crews (Crews Declaration).

According to Sanders, he never spoke with Crews, see Sanders

Deposition at 52; his mother called the FDOC Secretary's Office,

but Sanders has "no idea" whom she spoke to about the staff abuse,

id. at 68. He states: "I don't know if she ever spoke with [Crews]

personally. I know she also emailed them a copy of the letter I

sent her. . . ." Id. at 69.

Next, Sanders asserts that Defendant Beasley failed to protect

him when he knew about "the illegal actions" of Defendants Greene,

Crawford, Gartman, Landrum, North, Coates, Richter, Riegel,

Robertson, Perry, Capen, Lim, Meeks, Russell, Williamson,

Lamberson, Powe, and Jackson, and failed to correct the misconduct

when the grievances were forwarded to him for an investigation and

---

[29] See P. Ex., Doc. 137-8 at 5, 24.

appropriate action. See SAC at 32, ¶¶ 30, 31; 13, ¶ 11. Defendant Beasley states, in pertinent part, that he neither personally investigated any complaint, grievance, or allegation, nor directly supervised any investigation regarding any complaint, grievance, or allegation made in Sanders' case. See Def. Ex. JJ, Declaration of Jeffery T. Beasley (Beasley Declaration).

The fact that Defendants Landrum, Crews, and Beasley flatly deny that Sanders reported threats of fear (or suggest his sworn statement lacks credibility) to them, see Motion at 26-28; see also Landrum, Crews, and Beasley Declarations, provides insufficient grounds on which to grant summary judgment in their favor. In ruling on a motion for summary judgment, a court cannot engage in impermissible credibility determinations. See Furcron v. Mail Centers Plus, LLC, 843 F.3d 1295, 1304 (11th Cir. 2016); see also Crawford-El v. Britton, 523 U.S. 574, 600 (1998) (stating that, in a motion for summary judgment, it is improper to simply attack the opposing party's credibility); Hall v. Bennett, 447 F. App'x 921, 924 (11th Cir. 2011) (reversing the district court's grant of summary judgment because the court improperly "weighed the witnesses' credibility by favoring" the officer's account over the prisoner-plaintiff's). As such, Defendants' Motion is due to be denied as to Sanders' failure to protect claims against Defendants Landrum, Crews, and Beasley.

# H. Supervisory Liability

Sanders asserts that Defendants Landrum, Gartman, Mock, and Crews failed to properly supervise Greene, Coates, Stratton, Richter, Crawford, Jackson, North, Robertson, Russell, and Riegel when they knew about the ongoing misconduct, and failed to correct it. See SAC at 28, ¶ 13 (Gartman); 31, ¶ 25 (Landrum); 32, ¶ 29 (Crews); 33, ¶ 33 (Mock); 38, ¶ 60. The United States Court of Appeals for the Eleventh Circuit has stated:

> "Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994) (internal quotation marks and citation omitted). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Gonzalez, 325 F.3d at 1234 (internal quotation marks and citation omitted).[30] "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

> "The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" Cottone, 326 F.3d at 1360 (citation omitted).[31] "The deprivations that constitute widespread abuse sufficient to notify the supervising official

---

[30] Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003).

[31] Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003).

must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." <u>Brown</u>, 906 F.2d at 671. A plaintiff can also establish the necessary causal connection by showing "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," <u>Gonzalez</u>, 325 F.3d at 1235, or that a supervisor's "custom or policy . . . resulted in deliberate indifference to constitutional rights," <u>Rivas v. Freeman</u>, 940 F.2d 1491, 1495 (11th Cir. 1991).

<u>Danley v. Allen</u>, 540 F.3d 1298, 1314 (11th Cir. 2008) (<u>overruled on other grounds</u> as recognized by <u>Randall v. Scott</u>, 610 F.3d 701, 709 (11th Cir. 2008) (rejecting the application of a heightened pleading standard for § 1983 cases involving qualified immunity)); see <u>Keith v. DeKalb Cty., Ga.</u>, 749 F.3d 1034, 1047-48 (11th Cir. 2014). In sum,

To state a claim against a supervisory defendant, the plaintiff must allege (1) the supervisor's personal involvement in the violation of his constitutional rights,[32] (2) the existence of a custom or policy that resulted in deliberate indifference to the plaintiff's constitutional rights,[33] (3) facts supporting an inference that the supervisor directed the unlawful action or

---

[32] See <u>Goebert v. Lee Cty.</u>, 510 F.3d 1312, 1327 (11th Cir. 2007) ("Causation, of course, can be shown by personal participation in the constitutional violation.") (citation omitted).

[33] See <u>Goebert</u>, 510 F.3d at 1332 ("Our decisions establish that supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations.").

> knowingly failed to prevent it,[34] or (4) a
> history of widespread abuse that put the
> supervisor on notice of an alleged deprivation
> that he then failed to correct. <u>See</u> <u>id.</u> at
> 1328-29 (listing factors in context of summary
> judgment).[35] A supervisor cannot be held
> liable under § 1983 for mere negligence in the
> training or supervision of his employees.
> <u>Greason v. Kemp</u>, 891 F.2d 829, 836-37 (11th
> Cir. 1990).

<u>Barr v. Gee</u>, 437 F. App'x 865, 875 (11th Cir. 2011) (per curiam).

Sanders has alleged sworn facts suggesting that Defendants Landrum, Gartman, Mock, and Crews were personally involved in, or otherwise causally connected to, the alleged violations of his federal statutory or constitutional rights. On this record, there remains a genuine issue of material fact as to the extent of their involvement and whether the alleged violations could have been prevented. As such, Defendants' Motion is due to be denied as to Sanders' claims of supervisory liability (limited to the remaining Eighth Amendment failure to protect and First Amendment retaliation claims) against Defendants Landrum, Gartman, Mock, and Crews.

---

[34] <u>See</u> <u>Douglas v. Yates</u>, 535 F.3d 1316, 1322 (11th Cir. 2008) ("Douglas's complaint alleges that his family informed Yates [(an Assistant Warden)] of ongoing misconduct by Yates's subordinates and Yates failed to stop the misconduct. These allegations allow a reasonable inference that Yates knew that the subordinates would continue to engage in unconstitutional misconduct but failed to stop them from doing so.").

[35] <u>West v. Tillman</u>, 496 F.3d 1321 (11th Cir. 2007).

# I. Qualified Immunity

Defendants Beasley, Howard, North, Crawford, Greene, Markham, Mock, Richter, Riegel, Robertson, Russell, Wainwright, Powe, Lamberson, Jackson, Gartman, Crews, Landrum, Capen, Coates, Stratton, and Williamson assert that they are entitled to qualified immunity. <u>See</u> Motion at 36-37. As to qualified immunity, the Eleventh Circuit stated:

> The qualified-immunity defense reflects an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." <u>Keating v. City of Miami</u>, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).

> As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and alteration omitted).

> To invoke qualified immunity, a public official must first demonstrate that he was

acting within the scope of his or her discretionary authority. <u>Maddox v. Stephens</u>, 727 F.3d 1109, 1120 (11th Cir. 2013). As we have explained the term "discretionary authority," it "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." <u>Jordan v. Doe</u>, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it is clear that Defendant Officers satisfied this requirement, as they engaged in all of the challenged actions while on duty as police officers conducting investigative and seizure functions.

Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to [the plaintiff] to demonstrate that qualified immunity is inappropriate. <u>See id</u>. To do that, [the plaintiff] must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated [Plaintiff's] constitutional right and that that right was "clearly established ... in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officers' actions. <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), <u>overruled in part on other grounds</u> by <u>Pearson</u>, 555 U.S. 223, 129 S.Ct. 808. We may decide these issues in either order, but, to survive a qualified-immunity defense, [the plaintiff] must satisfy both showings. <u>Maddox</u>, 727 F.3d at 1120-21 (citation omitted).

<u>Jones v. Fransen</u>, 857 F.3d 843, 850-51 (11th Cir. 2017).

Defendants assert that they are entitled to qualified immunity because they did not commit any federal statutory or constitutional violation. <u>See</u> Motion at 36. Under the doctrine of qualified immunity, Defendants may claim they are entitled to qualified

immunity from monetary damages in their individual capacities. It is undisputed that Defendants were engaged in discretionary functions during the events at issue. To defeat qualified immunity with respect to these Defendants, Sanders must show both that a constitutional violation occurred, and that the constitutional right violated was clearly established.

Because the Court has determined that Sanders failed to establish the existence of an issue of fact as to Sanders' claim of a constitutional violation, Defendants are entitled to qualified immunity from monetary damages in their individual capacities as to Sanders': (1) Eighth Amendment claims relating to the April 24, 2014 cell extraction against Defendants Greene, Crawford, Powe, Jackson, Russell, Williamson, and Lamberson; (2) Eighth Amendment claims relating to the second May 20, 2014 use of force incident against Defendants Greene, Coates, and Wainwright; (3) conspiracy claim against Defendants Richter, Wainwright, Markham, and Stratton; (4) First Amendment retaliation claims relating to the DRs against Defendants Richter, Riegel, Crawford, Robertson, Capen, Greene, Russell, Coates, North, Wainwright, and Stratton; (5) Fourth and Fourteenth Amendment claims relating to property deprivation and the April 18, 2014 cell search against Defendants Richter, Crawford, Riegel, Robertson, and Capen; and (6) First Amendment claim relating to evidence tampering against Defendant

Howard. Their claims of qualified immunity as to Sanders' remaining counts are due to be denied.

## J. Eighth Amendment Deliberate Indifference

Sanders asserts that Defendants Lim, Perry, Bridges, Meeks, Randle, and Murphy[36] violated his Eighth Amendment right to be free from cruel and unusual punishment when: (1) Perry, Bridges, and Murphy failed to document and/or treat the injuries he sustained in the alleged April 24th use of force incident, see SAC at 39, ¶ 3; (2) Lim, Meeks, and Randle failed to report Sanders' assertions of staff abuse, see id. at ¶ 4; and (3) Randle acknowledged that officers were going to harm Sanders, but failed to take corrective action to stop the abuse, see id. at 39, ¶ 4; 40, ¶ 6. According to Sanders, he informed Lim on April 17th that officers had abused him on April 12th, see id. at 13, ¶ 12; Lim neither filed an incident report nor informed the administration about Sanders' assertions, see id.; after the cell extraction team's alleged April 24th use of force, officers escorted Sanders to the nurses station where Sanders informed Perry that Jackson had dislocated his thumb and popped it back into place, see id. at 16, ¶¶ 34, 35; Perry never documented Sanders' injuries and told Sanders that the officers should have broken his thumb, see id. at ¶ 35; Bridges and Murphy refused to see Sanders for sick call from April 28th through May

---

[36] The Court will refer to the Defendants, collectively, as "Medical Defendants."

17th, see id. at ¶¶ 38-40; medical personnel saw Sanders in sick call on May 17th, "but by then the swelling had [gone] down and the bruise was gone almost completely," see id. at ¶ 39; after the alleged May 20th use of force, Randle documented Sanders' injuries, see id. at 19, ¶ 60, and told Sanders: "They [are] going to kick your ass," see id. at 20, ¶ 65; and when Sanders asked Randle for help, Randle said she had nothing to do with it, and left the holding cell area, see id. at ¶ 66.

The Medical Defendants maintain that the record does not support Sanders' claims, and therefore, they are entitled to summary judgment. See Motion II at 2. They state that "[t]he medical records tell a different story," id. at 3, from Sanders' account, and they submitted portions of Sanders' medical records in support of their request for summary judgment, see Doc. 127-1.[37] They assert that: (1) after the April 24th incident, Perry documented Sanders' injuries when Sanders complained about knee pain from a previous injury and pain over his right eye; see id. at 3, 9; (2) Perry "found no new injuries" and "[n]othing in this record indicates Sanders ever complained of a thumb injury," id. at 9; (3) Murphy, Bridges, and Randle were not involved in Sanders' post use of force care on April 24th and May 20th, see id.; and (4)

_____

[37] The Medical Defendants did not submit any declarations in support of the request for summary judgment.

"nothing in the record shows [that] Lim and Meeks failed to respond to a known danger to Sanders[,]" id. at 12.

Sanders opposes Motion II. According to Sanders, Perry knew about his injured thumb and checked his left hand after the April 24th cell extraction, but failed to document the injury; Defendants Lim, Randle, and Meeks knew about the staff abuse and neither notified the officers in charge nor reported the abuse; Perry, Bridges, and Murphy refused to provide medical treatment after the April 24th use of force incident; and Randle knew Sanders was in danger of being assaulted and refused to take corrective action. See Response II at 1-4. The Medical Defendants filed a Motion for Leave to File a Reply Memorandum (Request; Doc. 144). In the Request, they seek permission to file a reply memorandum to clarify the issues. See Request at 2. The Request is due to be denied.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. Salvato v. Miley, 790 F.3d 1286, 1295 (11th Cir. 2015); Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citation omitted); Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (citations omitted). Moreover, the Eleventh Circuit "'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional

deprivation' in § 1983 cases." <u>Rodriguez</u>, 508 F.3d at 625 (quoting <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986)). In the absence of a federal constitutional deprivation or violation of a federal right, a plaintiff cannot sustain a cause of action against the defendants.

The Eleventh Circuit has explained the requirements for an Eighth Amendment violation.[38]

> "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." <u>Farmer</u>, 511 U.S. at 832, 114 S.Ct. at 1976 (internal quotation and citation omitted).[39] Thus, in its prohibition of "cruel and unusual punishments," the Eighth Amendment requires that prison officials provide humane conditions of confinement. <u>Id.</u> However, as noted above, only those conditions which objectively amount to an "extreme deprivation" violating contemporary standards of decency are subject to Eighth Amendment scrutiny. <u>Hudson</u>, 503 U.S. at 8-9, 112 S.Ct. at 1000.[40] Furthermore, it is only a prison official's subjective deliberate indifference to the substantial risk of serious harm caused by such conditions that gives rise to an Eighth Amendment violation. <u>Farmer</u>, 511 U.S. at 828, 114 S.Ct. at 1974 (quotation and citation omitted); <u>Wilson</u>, 501 U.S. at 303, 111 S.Ct. at 2327.[41]

---

[38] The Medical Defendants mistakenly assert that Sanders was a pretrial detainee, and therefore, his rights arise under the Due Process Clause of the Fourteenth Amendment. <u>See</u> Motion II at 7.

[39] <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).

[40] <u>Hudson v. McMillian</u>, 503 U.S. 1 (1992).

[41] <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991).

Thomas v. Bryant, 614 F.3d 1288, 1306-07 (11th Cir. 2010). "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)). First, the plaintiff must satisfy the objective component by showing that he had a serious medical need. Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007).

> "A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)). In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (citation and internal quotations marks omitted).

Brown, 387 F.3d at 1351.

Next, the plaintiff must satisfy the subjective component, which requires the plaintiff to "allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." Richardson, 598 F.3d at 737 (describing the three components of deliberate indifference as "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.") (citing Farrow, 320 F.3d at 1245); Lane v. Philbin, 835 F.3d 1302, 1308 (11th Cir.

2016) (setting forth the three components) (citing <u>Farrow</u>, 320 F.3d at 1245).

> In <u>Estelle</u>[42], the Supreme Court established that "deliberate indifference" entails more than mere negligence. <u>Estelle</u>, 429 U.S. at 106, 97 S.Ct. 285; <u>Farmer</u>, 511 U.S. at 835, 114 S.Ct. 1970. The Supreme Court clarified the "deliberate indifference" standard in <u>Farmer</u> by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837, 114 S.Ct. 1970 (emphasis added). In interpreting <u>Farmer</u> and <u>Estelle</u>, this Court explained in <u>McElligott</u>[43] that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." <u>McElligott</u>, 182 F.3d at 1255; <u>Taylor</u>,[44] 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

<u>Farrow</u>, 320 F.3d at 1245-46.

On this record, considering the statements in Sanders' verified SAC, his deposition testimony, the medical records, and the use of force video (Def. Ex. T), this Court finds that genuine

---

[42] <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976).

[43] <u>McElligott v. Foley</u>, 182 F.3d 1248 (11th Cir. 1999).

[44] <u>Taylor v. Adams</u>, 221 F.3d 1254 (11th Cir. 2000).

issues of material fact (as to whether the Medical Defendants participated in alleged violations of Sanders' Eighth Amendment right when they neither documented nor treated his injuries nor took corrective action to remedy the alleged unlawful acts of which they were aware) preclude entry of summary judgment in their favor. As such, Motion II is due to be denied.

## K. Appointment of Counsel

A plaintiff in a civil case has no constitutional right to counsel.[45] A court may, however, pursuant to 28 U.S.C. § 1915(e)(1), appoint counsel for an indigent plaintiff only in exceptional circumstances. See Bass v. Perrin, 170 F.3d 1312, 1320 (11th Cir. 1999). Such exceptional circumstances exist "where the facts and legal issues are so novel or complex as to require the assistance of a trained practitioner." Fowler v. Jones, 899 F.2d 1088, 1096 (11th Cir. 1990). In determining whether to appoint counsel, a court may consider the type and complexity of the case and whether the plaintiff can adequately present his case. See Ulmer v. Chancellor, 691 F.2d 209, 213 (5th Cir. 1982); Smith v. Fla. Dep't of Corr., 713 F.3d 1059, 1065 n.11 (11th Cir. 2013)).

Given the number of remaining Defendants and claims, appointment of counsel is likely warranted at this stage of the

---

[45] During the early stage of litigation, Sanders filed a request for the appointment of counsel. See Motion for Appointment of Counsel (Doc. 7), filed March 4, 2015. The Court denied the request on August 31, 2015. See Order (Doc. 9).

litigation. Therefore, this case will be referred to the Jacksonville Division Civil Pro Bono Appointment Program so that the designated deputy clerk of this Court may seek counsel to represent Sanders. Due to the limited resources of the program and the economy's impact upon those resources, the process of finding counsel may take some time. Therefore, the Court will stay and administratively close the case for ninety (90) days to try to find counsel. Sanders must await this Court's notification to him as to when counsel has been found to represent him. The Court cautions Sanders that it may be difficult to find pro bono counsel due to the number of remaining Defendants and claims.

In consideration of the foregoing, it is now

**ORDERED**:

1. Defendants' Motion for Summary Judgment (Doc. 129) is **GRANTED** as to Sanders': (1) Eighth Amendment claims relating to the April 24, 2014 cell extraction against Defendants Greene, Crawford, Powe, Jackson, Russell, Williamson, and Lamberson; (2) Eighth Amendment claims relating to the second May 20, 2014 use of force incident against Defendants Greene, Coates, and Wainwright; (3) conspiracy claim against Defendants Richter, Wainwright, Markham, and Stratton; (4) First Amendment retaliation claims relating to the DRs against Defendants Richter, Riegel, Crawford, Robertson, Capen, Greene, Russell, Coates, North, Wainwright, and Stratton; (5) Fourth and Fourteenth Amendment claims relating to property

deprivation and the April 18, 2014 cell search against Defendants Richter, Crawford, Riegel, Robertson, and Capen; and (6) First Amendment claim relating to evidence tampering against Defendant Howard. Judgment in their favor will be withheld pending adjudication of the action as a whole. <u>See</u> Fed. R. Civ. P. 54.

2. Defendants' Motion for Summary Judgment (Doc. 129) is **GRANTED** on the basis of qualified immunity only to the extent provided in the Order.

3. Defendants' Motion for Summary Judgment (Doc. 129) is **GRANTED** as to Sanders' claim for monetary damages from the Defendants in their official capacities.

4. Defendants' Motion for Summary Judgment (Doc. 129) is **DENIED** as to Sanders': (1) Eighth Amendment claims relating to the first May 20, 2014 use of force incident against Defendants Greene, Stratton, Richter, and Coates; (2) Eighth Amendment claims relating to the third May 20, 2014 use of force incident against Defendants North, Richter, Wainwright, and Markham; (3) First Amendment retaliation claims relating to food deprivation against Defendants Greene, Coates, Richter, and Stratton; (4) First Amendment retaliation claims against Defendants Gartman and Mock; (5) Eighth Amendment failure to protect claims against Defendants Gartman, Mock, Landrum, Crews, and Beasley; and (6) supervisory liability claims (limited to the remaining Eighth Amendment failure to protect and First Amendment retaliation claims) against Defendants

Landrum, Gartman, Mock, and Crews. Any remaining portions of Defendants' Motion for Summary Judgment are **DENIED.**

5.   Defendants Lim, Perry, Bridges, Meeks, Randle and Murphy's Motion for Summary Judgment (Doc. 128) is **DENIED**.

6.   Defendants Lim, Perry, Bridges, Meeks, Randle, and Murphy's Motion for Leave to File a Reply Memorandum (Doc. 144) is **DENIED**.

7.   The following Defendants are **DISMISSED** from the action: (1) Nancy Crawford; (2) Brad A. Howard; (3) Chad Robertson; (4) Markus Jackson; (5) Arthur Riegel III; (6) Daniel Russell; (7) D.P. Capen; (8) Bryan Williamson; (9) Robert Lamberson; and (10) Jeremy Powe. The Clerk shall terminate them as Defendants.

8.   This case is referred to the Jacksonville Division Civil Pro Bono Appointment Program so that the designated deputy clerk of this Court may seek counsel to represent Sanders. This case is **STAYED for ninety (90) days**, and the Clerk is directed to administratively close the case.

9.  The Clerk must provide a copy of this Order to the designated deputy clerk for the Jacksonville Division Civil Pro Bono Appointment Program.

**DONE AND ORDERED** at Jacksonville, Florida, this 14th day of March, 2018.


MARCIA MORALES HOWARD
United States District Judge


sc 3/13
c:
Christopher Sanders, FDOC #R24565
Counsel of Record